662 A.2d 494

JOSEPH V. DITROLIO, M.D., PLAINTIFF–RESPONDENT, v. LEON-
ARD ANTILES, M.D., PETER BOORJIAN, M.D., DOMENICK
FALCONE, M.D., OLEH BACHYNSKY, M.D., AND THE MONT-
CLAIR UROLOGICAL GROUP, DEFENDANTS–APPELLANTS,
AND JANE DOE, A FICTITIOUS DEFENDANT, JOHN DOE, A
FICTITIOUS DEFENDANT, AND XYZ, P.A., A FICTITIOUS DE-
FENDANT, DEFENDANTS.

Argued March 28, 1995—Decided August 1, 1995.

254

*Glenn A. Clark* argued the cause for appellants Leonard Antiles, M.D., Peter Boorjian, M.D., Domenick Falcone, M.D., and Oleh Bachynsky, M.D. (*Riker, Danzig, Scherer, Hyland & Perretti*, attorneys; *Mr. Clark* and *Edward A. Zunz, Jr.*, of counsel; *Mr. Clark* and *Barbara J. Scheader*, on the briefs).

*David P. Weeks* argued the cause for appellant Montclair Urological Group (*Mackenzie, Welt, Maher, North & Weeks*, attorneys).

*Frank R. Ciesla* argued the cause for respondent (*Giordano, Halleran & Ciesla,* attorneys; *Mr. Ciesla, John F. Varley, III,* and *James L. Petsche,* on the brief).

The opinion of the Court was delivered by

HANDLER, J.

In this case, we again consider the scope of the entire controversy doctrine. The occasion is presented in an action by a doctor seeking monetary damages for a variety of tortious acts committed by four doctors and their professional medical group. Plaintiff claims that as a result of the actions of the doctors, who are on the medical staff of a hospital, he was wrongfully denied full promotional staff privileges at the hospital and suffered consequential damages. This action follows a previous law suit against the hospital and its board of trustees, in which plaintiff sought to obtain the privileges that he claimed were unfairly denied.

We must determine whether the entire controversy doctrine is applicable to bar the current action because the facts giving rise to the tort claims against the doctors and their medical group also gave rise to the claims against the hospital and its trustees in the earlier action. The issue is, basically, whether a sufficient commonality of facts undergirds each set of claims to constitute essentially a single controversy that should be the subject of only one litigation.

The trial court applied the entire controversy doctrine to bar the current action. The Appellate Division reversed. 276 *N.J.Super.* 234, 647 *A.*2d 1318 (1994). The appeal is before us as the result of a dissent in the Appellate Division. *R.* 2:2–1.

I

In 1984, plaintiff Joseph DiTrolio was admitted to the medical staff of Mountainside Hospital (Hospital) as a provisional staff member in the Department of Urology (Department), and as such, was subject to supervision and observation by active staff mem-

bers. 276 *N.J.Super.* at 238, 647 *A.*2d 1318. The Hospital's bylaws provided that an appointment as a provisional staff member was for a two-year term, whereupon the individual could either be promoted to the position of active staff member in the rank of an associate attending physician, with no supervision, or reappointed for a single additional term, as a provisional staff member with supervision. *Ibid.*

At the time of plaintiff's appointment, the Department of Urology consisted of four voting members: Drs. Leonard Antiles, Peter Boorjian, Domenick Falcone and Oleh Bachynsky. Dr. Antiles was the director of the Department. Three of the voting members, Drs. Antiles, Boorjian and Falcone, were shareholders in the Montclair Urological Group. *Ibid.*

Plaintiff maintains that from the beginning of his affiliation with the Hospital in 1984, the doctors engaged in conduct "for the sole purpose of interfering with his ability to treat patients there." Specifically, plaintiff points to numerous scheduling problems. The doctors, who supervised plaintiff during surgery, would often cancel at the last minute. Consequently, plaintiff claims that he was "forced to limit his hospital admissions to only a handful of patients each year."

After two years as provisional staff, plaintiff became eligible for appointment to the active medical staff of the Hospital. The bylaws required the Department to make a recommendation concerning plaintiff's medical competency. In September 1986, the Department submitted its recommendation to the Medical Staff Membership and Credentials Committee (M & C Committee). The same four doctors who comprised the Urology Department also at that time comprised the entire M & C Committee. The Urology Department recommended against plaintiff's appointment as an active staff member and for reappointment as a provisional staff member under continued supervision and observation. *Id.* at 238–39, 647 *A.*2d 1318. In their review of plaintiff's record, the members of the Department determined "that Dr. DiTrolio has not done a sufficient number of cases to have supervision and

observation removed. Therefore, he is not eligible to be promoted to Associate Attending." *Id.* at 239, 647 *A.*2d 1318. The Department, however, also recommended that plaintiff be permitted to perform four specified procedures without supervision or observation. *Ibid.* The M & C Committee accepted these recommendations. *Ibid.*

Specifically, the Department was concerned about plaintiff's medical care in two cases that had been the subject of Department Quality Assurance presentations. The Department viewed these cases as involving "substandard" medical care and informed plaintiff at a September 11, 1986 meeting that if "the quality of his work does not improve significantly ... the Department will not recommend the appointment to the Staff at the end of the provisional period."

The following year, on August 20, 1987, plaintiff once again requested promotion from provisional to associate attending status. *Ibid.* Because the Hospital's medical bylaws provide that a candidate can be reappointed to the provisional staff only once, the only options available to the doctors at this time were to recommend that plaintiff either be appointed as a full-fledged active staff member or to reject his appointment completely.

Once again, the Department recommended against the promotion, citing seven cases that "typified Dr. DiTrolio's inability to perform up to the standards of the Mountainside Urology Department." *Ibid.* The M & C Committee on February 16, 1988, accepted the Department's recommendation that plaintiff "not be reappointed to the [Hospital] medical staff because of his inability to maintain adequacy of medical care in the [Department]." *Ibid.* The Committee further recommended that plaintiff "however continue with his current privileges until due process is completed." *Ibid.*

In a letter dated February 17, 1988, plaintiff's attorney requested a hearing pursuant to the Hospital bylaws regarding plaintiff's "application for promotion to associate attending status ... and removal of all departmental observation and supervision," assert-

ing "that the Membership and Credentials Committee has failed to submit to the Medical Board a recommendation regarding Dr. DiTrolio's application for promotion from provisional to associate status." *Ibid.* Based on this request, an ad hoc committee of the Hospital's medical staff (Ad Hoc Committee) was constituted. *Ibid.* It conducted hearings on nine non-consecutive days between May 18 and July 5, 1988. *Ibid.* Plaintiff was represented by counsel throughout the ad hoc hearing. The Department doctors testified, as well as the Chairman of the M & C Committee and the Director of Medical Records. Plaintiff testified on his own behalf, and additionally presented two independent expert witnesses who testified that plaintiff did not violate accepted standards of medical care in the seven cases. Plaintiff also called the Hospital's Medical Staff President, the Hospital's Chief Executive Officer, and another doctor as witnesses. The hearing generated 1100 pages of transcripts.

In September 1988, The Ad Hoc Committee concluded that plaintiff should be promoted and that his medical care was satisfactory. In its review of the seven cases presented, the Ad Hoc Committee determined that plaintiff's overall management of the seven cases "was generally acceptable and does not justify a recommendation for non-reappointment." *Id.* at 240, 647 *A.*2d 1318. The Ad Hoc Committee also recommended that because plaintiff had not had an opportunity to demonstrate competence at the Hospital in three areas of complex urological surgery, that before unsupervised surgical privileges be granted with respect to radical nephrectomy, open uretal procedures, and cystectomy, plaintiff

> present evidence, such as two or three cases in each category, done at another hospital for review of adequacy by an Ad Hoc Committee. This Committee should include at least one urological consultant from another hospital. In the event that this material is not available, an outside urologist should be hired by the hospital to supervise these cases done at Mountainside Hospital. This consultant should report directly to the Medical Staff President.
>
> [*Ibid.*]

Additionally, the Ad Hoc Committee expressed concern about "the procedures followed by the Department of Urology and the

Membership and Credential Committee in this case," but noted that it "cannot conclude that there was intentional wrongdoing." *Ibid.* The specific concerns were:

1. Department of Urology meetings were held in the Chairman's office, rather than in the hospital. Because departmental meetings are official hospital business, they should be conducted on the hospital premises.

2. Assigning supervision has apparently been at the sole discretion of the Chairman. A specific procedure for assigning supervision should be included in the Department rules, and all active members of the Department should be included to provide broadened assessment of competence.

3. The Committee is concerned that Dr. DiTrolio was not adequately informed and properly counseled at the time criticisms of his work apparently arose. It is extremely important that if alleged deficiencies exist, they be discussed openly and constructively with the physician under supervision *at the time* they occur, not only in fairness to the physician, but in order to maintain and improve patient care in an ongoing basis.

4. The Committee is concerned that specific criteria for advancing a physician from the Provisional Staff or removing supervision and observation do not exist. Each Department should establish such criteria, which should be included in Department Rules and Regulations and which should include a reasonable number of cases, by category, to be reviewed, particularly in departments doing technical procedures. The total period of supervision and observation should not be inordinately long and generally should be completed well before initial application for promotion to the active Staff.

5. Supervision should not be reinstituted in accordance with due process in our By-laws.

6. To foster professional and administrative vitality within each department, directors should not serve more than two consecutive 2-year terms during any 8-year period.

7. To promote impartiality, the Membership and Credentials Committee should not consist of Department Directors. The Chairman should be an At-Large member of the Medical Board and other members appointed by the President and Medical Staff or elected by the Medical Staff as a whole.

8. The Committee is concerned about the process which was followed in the Membership and Credentials Committee. Since serious criticism of a physician could affect his or her hospital privileges, it is imperative that the basis of that criticism be meticulously explored. Written procedures for the process should be established, which should include a factfinding committee which would be empowered to perform a complete investigation and make recommendations to the full Committee.

9. The hearing process in our By-laws should be reviewed and revised.

10. A member's file should be available to him.

[*Id.* at 240–41, 647 A.2d 1318.]

In October 1988, the Hospital's Medical Board (Medical Board) agreed with the Ad Hoc Committee's recommendation that plaintiff should be promoted to an Associate Attending at the Hospital. *Id.* at 241, 647 *A.*2d 1318. The Medical Board, however, concluded that plaintiff should be subjected to continued supervision by the Urology Department, and not by outside urologists, because he had deviated from the "standard of good urological treatment" in two cases. The Medical Board also chose not to provide plaintiff with the option of presenting clinical evidence from another hospital to demonstrate his competency in the three urological procedures.

Pursuant to the Hospital's bylaws, plaintiff requested appellate review by the Hospital's Board of Trustees. *Id.* at 242, 647 *A.*2d 1318. The Board appointed an Appellate Review Committee, which reported on February 2, 1989. *Ibid.* The Appellate Review Committee agreed with the Medical Board's conclusions that (1) plaintiff "should be reappointed to the Medical Staff with the rank of Associate Attending in the Department of Urology;" and (2) plaintiff should be supervised by Mountainside Department Urologists in three types of Urological procedures. The Committee noted:

> While it is true that there have been some conflicts between Dr. DiTrolio and his supervisors, the Committee expects that both Dr. DiTrolio and the Department members who act as supervisors will act professionally and responsibly to assure the quality of patient care in the Hospital. The Committee expects that supervision of Dr. DiTrolio can and will be carried out in the future appropriately in accordance with the regular procedures of the Department and the Rules and Regulations of the Medical staff.
>
> [*Id.* at 243, 647 *A.*2d 1318.]

On February 13, 1989, the Board of Trustees adopted the findings and conclusions of the Appellate Review Committee. *Ibid.*

Plaintiff thereafter filed suit against the Hospital and its Board of Trustees in the Chancery Division alleging that the Medical Board's decision was arbitrary and capricious, failed to comport with Medical Staff bylaws, and deprived defendant of his "right to due process under the Bylaws and New Jersey case law." Specifi-

cally, plaintiff contended that the procedures followed by the Hospital's Medical Board and Board of Trustees on appeal of the Ad Hoc Committee's recommendations were flawed because (1) the Medical Board considered evidence not presented at the ad hoc hearing in violation of the bylaws, and that evidence, presented by Dr. Antiles, contained significant misrepresentations of fact; (2) plaintiff was denied his right to have counsel present at any hearing regarding his privileges; (3) plaintiff was denied his right to disclosure of the information; and (4) the Board breached its duty by failing to base its determination solely on the recommendation of the M & C Committee, the transcripts of the hearings, and the conclusions of the Ad Hoc Committee. Plaintiff thus requested on Order compelling the Hospital and the Board of Trustees to adopt and enforce the Ad Hoc Committee's full recommendation, including the conclusion that plaintiff should be supervised by an outside urologist or be allowed to perform the three procedures at other hospitals.

The complaint named Drs. Antiles, Boorjian, Falcone and Bachynsky in support of plaintiff's allegation that the Medical Board violated his due process rights. It stated that the four doctors, as the only members of the M & C Committee of the Department of Urology, decided against recommending plaintiff for reappointment at their October 1987 meeting, without having read the charts of the seven cases considered. Furthermore, the complaint alleged that these same four doctors, who also comprised the only voting members of the Department, unanimously decided not to recommend plaintiff for reappointment in 1987. Dr. Antiles, as Director of the Department, presented the recommendation to the M & C Committee. The complaint asserted that "all four doctors are direct economic competitors of Dr. DiTrolio," and that Drs. Antiles, Falcone and Boorjian are part of the same practice group.

The complaint further alleged that Drs. Antiles, Falcone, Boorjian and Bachynsky, testified at the ad hoc hearing in support of the M & C Committee's decision not to reappoint plaintiff. According to the complaint, the medical staff "did not introduce any indepen-

dent physicians to testify regarding Dr. DiTrolio's competence or the quality of his patient care." The complaint also asserted that Dr. Antiles presented new evidence to the Medical Board not considered by the Ad Hoc Committee in contravention of the Hospital bylaws, and that "Dr. Antiles significantly misrepresented certain facts to the Medical Board in discussing certain of the seven cases." In total, the complaint mentioned Dr. Antiles by name 13 times, Drs. Falcone and Boorjian four times, and Dr. Bachynsky three times.

Discovery began and continued for almost a year. Depositions were taken of Drs. Antiles and Falcone on December 21, 1989. Drs. Boorjian, and Bachynsky were each deposed on December 28, 1989. On May 4, 1990, plaintiff and the Hospital reached a settlement agreement in which plaintiff agreed to dismiss the then-pending lawsuit without prejudice, and also agreed not to institute a new action against the Hospital and its Board of Trustees based upon the foregoing allegations or any conduct of those defendants preceding February 8, 1989. *Id.* at 244, 647 *A.2d* 1318. The stipulation of agreement also contained the following provisions:

> The plaintiff, by entering into the Stipulation of Settlement and by having this action dismissed without prejudice, in no way is limited in pursuing an action(s) against any individual(s) or entity(ies) other than the defendants in this action nor shall the Stipulation of Settlement or Dismissal Without Prejudice constitute collateral estoppel.
>
> The filing of the Dismissal Without Prejudice and this Stipulation shall in no way affect the plaintiff's rights with respect to future applications for full privileges without supervision at the Mountainside Hospital in Montclair.
>
> [*Ibid.*]

Six days after the settlement was signed, plaintiff brought suit against Drs. Antiles, Boorjian, Falcone and Bachynsky, and the Montclair Urological Group, seeking money damages, compensatory and punitive, for injuries to his reputation and his economic well-being and for emotional distress. This suit alleges "interference with business and professional relationships and with prospective economic advantage; defamation; intentional infliction of emotional distress; and conspiracy to monopolize the practice of

urology at the Hospital." *Id.* at 245, 647 *A.*2d 1318. Plaintiff sued the Group because the

> numerous misrepresentations, criticisms and interference with patient care by Dr. Antiles, Dr. Boorjian and Dr. Falcone ... were in furtherance of economic gain for Defendant Montclair Urological Group. Their relationship with Montclair Urological Group and the control it has over the Department of Urology at Mountainside Hospital, enabled Dr. Antiles, Dr. Boorjian and Dr. Falcone to improperly interfere with [plaintiff's] practice at the Hospital.

The trial court granted defendant's motion for summary judgment, concluding that defendants were entitled to judgment under the entire controversy doctrine as enunciated in *Cogdell v. Hospital Center,* 116 *N.J.* 7, 560 *A.*2d 1169 (1989).

The Appellate Division reversed. The majority concluded that the entire controversy doctrine does not apply because the remedies sought in the two suits are "very different." *Id.* at 248, 647 *A.*2d 1318. Judge Skillman filed a concurring opinion, concluding that the entire controversy doctrine is not applicable because the prior litigation was settled without prejudice. *Id.* at 253, 647 *A.*2d 1318. The appeal is before us by virtue of Judge Michels' dissent based on his conclusion that the entire controversy doctrine should apply to bar the second action. *Id.* at 255–69, 647 *A.*2d 1318.

We now reverse the Appellate Division determination, substantially for the reasons expressed in Judge Michels' dissenting opinion.

II

*Rule* 4:30A, which codifies the entire controversy doctrine, provides:

> Non-joinder of claims or parties required to be joined by the entire controversy doctrine shall result in the preclusion of omitted claims to the extent required by the entire controversy doctrine, except as otherwise provided by *R.* 4:64–5 (foreclosure actions) and *R.* 4:67–4(a) (leave required for counterclaims or cross-claims in summary actions).

Originally, the doctrine mandated joinder of only those claims arising from "the same overall transaction" involving the parties already named in the lawsuit. *Crispin v. Volkswagenwerk, A.G.,* 96 *N.J.* 336, 343–44, 476 *A.*2d 250 (1984) (recognizing that exten-

sion of entire controversy doctrine to include mandatory joinder of parties may be appropriate, but refusing to extend doctrine outright); *Tall Timbers Property Owners Ass'n v. Tall Timbers, Inc.*, 217 *N.J.Super.* 119, 123, 524 *A.2d* 1315 (App.Div.1987). In 1989, however, this Court extended the entire controversy doctrine to mandate joinder of "all parties with a material interest, one that can affect or be affected by the judicial outcome of a legal controversy." *Cogdell v. Hospital Ctr.*, *supra*, 116 *N.J.* at 23, 560 *A.2d* 1169. In expanding the doctrine, we reasoned that the party-joinder rule, *R.* 4:28-1, and the claims-joinder rule, *R.* 4:27-1, both "reflect a common policy" and "are not only conceptually similar but are procedural twins." *Id.* at 17, 560 *A.2d* 1169.

■ The fundamental principle behind the inclusion policy of the entire controversy doctrine is that

> the adjudication of a legal controversy should occur in one litigation in only one court; accordingly, all parties involved in a litigation should at the very least present in that proceeding all of their claims and defenses that are related to the underlying controversy.
>
> [*Id.* at 15, 560 *A.2d* 1169 (citation omitted).]

The doctrine reflects a basic concept of judicial administration that is of constitutional dimension. *See* N.J. Const. (1947), art. VI, § 3, ¶ 4. The purposes of the doctrine are threefold: (1) the need for complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay. *Cogdell*, *supra*, 116 *N.J.* at 15, 560 *A.2d* 1169.

■ In determining whether successive claims constitute one controversy for purposes of the doctrine, the central consideration is whether the claims against the different parties arise from related facts or the same transaction or series of transactions. *See Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank*, 163 *N.J.Super.* 463, 497, 395 *A.2d* 222 (App.Div.1978), *certif. denied*, 79 *N.J.* 488, 401 *A.2d* 243 (1979). It is the core set of facts that provides the link between distinct claims against the same or different parties and triggers the requirement that they

be determined in one proceeding. *See Newmark v. Gimbel's, Inc.,* 54 *N.J.* 585, 600–01, 258 *A.*2d 697 (1969); *Applestein v. United Bd. & Carton Corp.,* 35 *N.J.* 343, 356, 173 *A.*2d 225 (1961); *Vacca v. Stika,* 21 *N.J.* 471, 476, 122 *A.*2d 619 (1956); *Ajamian v. Schlanger,* 14 *N.J.* 483, 488, 103 *A.*2d 9, *cert. denied,* 348 *U.S.* 835, 75 *S.Ct.* 58, 99 *L.Ed.* 659 (1954). One measure of whether distinct claims are part of an entire controversy is whether parties have a significant interest in the disposition of a particular claim, one that may materially affect or be materially affected by the disposition of that claim. *Cogdell, supra,* 116 *N.J.* at 23, 560 *A.*2d 1169. The test for whether claims are "related" such that they must be brought in a single action under New Jersey entire controversy doctrine was expressed in *O'Shea v. Amoco Oil Co.,* 886 *F.*2d 584 (3d Cir.1989), as follows: if parties or persons will, after final judgment is entered, be likely to have to engage in additional litigation to conclusively dispose of their respective bundles of rights and liabilities that derive from a single transaction or related series of transactions, the omitted components of the dispute or controversy must be regarded as constituting an element of one mandatory unit of litigation. *Id.* at 590–91.

In this case, defendants named in the second suit had a "material interest" in the first suit sufficient to mandate joinder of those defendants in that suit. 276 *N.J.Super.* at 261, 647 *A.*2d 1318 (Michels, J. dissenting) (citing *Cogdell, supra,* 116 *N.J.* at 26, 560 *A.*2d 1169). The first complaint alleged that the review process conducted by the Hospital and its Board of Trustees resulted in a decision that was arbitrary and capricious, was based on false evidence and deprived plaintiff of due process. In that suit, plaintiff demanded equitable relief, specifically, that he be reappointed to the Hospital's Medical Staff with the rank of Associate Attending in the Department of Urology, and that he be supervised either in another hospital or by an outside physician hired by the Hospital. In contrast, the second complaint against the defendant-doctors demands money damages primarily to compensate plaintiff for the alleged tortious conduct of the individual

defendants. We agree with Judge Michels' conclusion that "[a]l-though the two complaints allege different causes of action in law and equity, the factual bases of both actions are identical[,]" and thus "plaintiff cannot fractionalize this litigation in order to save his second suit from dismissal." 276 *N.J.Super.* at 261, 647 *A.*2d 1318.

Most of the same evidence presented in plaintiff's first suit is not only relevant to his suit against the individual doctors, but actually formed the basis for this claim. In the first suit, at least nineteen paragraphs of the complaint specifically implicated defendants in the factual allegations forming the basis of the action against the Hospital and the Board of Trustees. The complaint alleged various improper procedures taken by the four defendant-doctors. It stated that when the Department, the voting members of which were comprised of the four defendant-doctors in this case, discussed plaintiff's medical cases, all discussions took place out of the presence of either plaintiff or his attorney. The complaint further stated that the doctors were direct economic competitors of plaintiff, and that these doctors failed to review the plaintiff's medical charts before recommending against his appointment. Moreover, the complaint alleged that Dr. Antiles significantly misrepresented certain facts regarding plaintiff's cases to the Medical Board.

Plaintiff's first complaint also alleged that the Medical Board's denial of plaintiff's application for full staff membership "did not rely upon sufficient reliable evidence and [was] not founded on reasonable sensible grounds." Accordingly, "[i]n adopting the actions, findings and recommendations of the Medical Board, the Board of Trustees' conclusions and recommendations did not rely upon sufficient reliable evidence and were not founded on reasonable grounds." In addition, the complaint alleged that the Hospital and its Board of Trustees acted arbitrarily and capriciously in adopting those findings.

Judge Michels correctly pointed out that the gravamen of plaintiff's complaint against the Hospital stemmed from the al-

leged uninformed recommendations resulting in large measure from the tortious actions of the four doctors, who comprised both the Urology Department and the M & C Committee responsible for making recommendations as to an applicant's medical competency.

> All of these allegations were founded in a factual scenario that begins with the actions of the four doctors named as defendants in this second suit. The doctors' recommendations and presentation of evidence at the in-house hospital hearings form the basis of the Medical Board's report and recommendation. That recommendation, in turn, provided the basis of the final decision rendered by the Hospital after the completion of all appellate processes. Thus, the doctors' conduct, recommendations, and submission of evidence are inseparably entangled with the Hospital's review procedures, which plaintiff challenged in the first suit. As Judge Fuentes [the trial judge] so appropriately observed, "It is the defendant doctors' involvement in that procedural process that created the factual basis for the second lawsuit." There is no question that defendants had a material interest in the first suit.
>
> [*Id.* at 261–62, 647 *A.*2d 1318 (Michels, J. dissenting).]

Moreover, as Judge Michels found, joinder of the defendant-doctors would have advanced the goal that the ultimate determination of the action would be "comprehensive, just and conclusive as to all persons implicated in the controversy." *Id.* at 262, 647 *A.*2d 1318 (citing *Cogdell, supra,* 116 *N.J.* at 25, 560 *A.*2d 1169). Naming the doctors as parties might have broadened the scope of discovery in the first suit by enabling them actively to participate. *Ibid.* Joinder could have helped to reveal whether the Hospital's decisions were based on unreliable evidence or whether the supposedly unreliable evidence was, in fact, the product of false and tortious information provided by defendant-doctors. Thus, "the participation of all potentially responsible parties in the original action would have resulted in a fuller and fairer presentation of the relevant evidence and would have enabled the [factfinder] to make a more informed and complete determination of liability." *Cogdell, supra,* 116 *N.J.* at 25, 560 *A.*2d 1169.

The Appellate Division characterized the two suits as entirely dissimilar, even though they stemmed from related facts, because the first suit focused on the soundness of the Hospital's decision and the fairness of its decisionmaking process, while the second

suit sought damages for injuries attributable to the conduct of certain individuals. It reasoned that the single controversy test required not merely a shared involvement in the underlying facts, but also an "objectively ascertainable practical commonality between legal issues as well." *Id.* at 251, 647 A.2d 1318.

The entire controversy doctrine does not require commonality of legal issues. Rather, the determinative consideration is whether distinct claims are aspects of a single larger controversy because they arise from interrelated facts. We have long recognized that the same set of facts can give rise to discrete causes of action and different kinds of relief. *See Orr v. Orr,* 36 *N.J.* 236, 176 A.2d 241 (1961) (recognizing that same tortious act may give rise to two or more separate causes of action). A plaintiff bringing an action based on two distinct legal theories is required to bring those claims together in one proceeding. *Aetna Ins. Co. v. Gilchrist Bros., Inc.,* 85 *N.J.* 550, 556–57, 428 A.2d 1254 (1981) (ruling policy that all matters in controversy, whether legal or equitable, be disposed of in one suit in one court to obviate multiplicity of suits requires that party include in action all related claims against adversary); *New Jersey Highway Auth. v. Renner,* 18 *N.J.* 485, 492, 114 A.2d 555 (1955) (recognizing that judicial system contemplates that, generally, all matters in controversy between parties, whether legal or equitable, will be disposed of in one action). Indeed, the Legislature itself has expressly recognized in different contexts that a single controversy, one arising from a common set of underlying facts, may generate different causes of action that nonetheless must be brought in one proceeding under the mantra of one adjudication. *E.g.,* New Jersey Law Against Discrimination, *N.J.S.A.* 10:5–1 to –42 (LAD) (providing for single action that can include common law and equitable remedies, and expressly reversing *Shaner v. Horizon Bancorp.,* 116 *N.J.* 433, 561 A.2d 1130 (1989), in which this Court ruled that statute did not authorize traditional common law remedies and jury trial in LAD action); *cf. Young v. Schering Corp.,* 141 *N.J.* 16, 660 A.2d 1153 (1995) (recognizing implicitly that because of

breadth of entire controversy doctrine, waiver provision, *N.J.S.A.* 34:19-8, within Conscientious Employee Protection Act, *N.J.S.A.* 34:19-1 to -8, (CEPA), should be construed narrowly to apply to only those causes of action arising from a common set of underlying facts that specifically involve retaliatory conduct).

The Appellate Division based its rejection of the entire controversy doctrine in this case largely on the fact that plaintiff's successive claims seek different remedial relief against different defendants. 276 *N.J.Super.* at 248–51, 647 *A.*2d 1318. That position ignores, however, that a controversy between or among persons that arises from a core set of related factual circumstances may trigger different claims against different parties. It is this commonality of facts, rather than the commonality of issues, parties or remedies that defines the scope of the controversy and implicates the joinder requirements of the entire controversy doctrine.

If disparate claims must be joined against one defendant, *e.g., Aetna Ins. Co., supra; Renner, supra,* the mandatory joinder doctrine requires that such claims must also be joined against all defendants, subject, of course, to the supervisory authority of the court to modify or alter such joinder. *Cogdell, supra,* 116 *N.J.* at 27–28, 560 *A.*2d 1169; *Petrocelli v. Daniel Woodhead Co.,* 993 *F.*2d 27, 31 (3d Cir.1993) (entire controversy doctrine does not require that all claims and parties culminate in one litigation; rather all claims and parties must initially be joined together for the court, which can then determine how to proceed with various claims and parties).

### III

The "polestar of the application of the rule is judicial 'fairness.'" *Reno Auto Sales, Inc. v. Prospect Park Sav. and Loan Ass'n,* 243 *N.J.Super.* 624, 630, 581 *A.*2d 109 (App.Div.1990) (citing *Cogdell, supra,* 116 *N.J.* at 28, 560 *A.*2d 1169). Fairness, in the context of party joinder, focuses on basic fairness to all of the parties, especially those sued in the second suit who were prevent-

ed from participating in the first. In *Cogdell, supra,* we explained that the party-joinder rule "tries foremost to protect an absent person from an adjudication of his or her interests; it also protects all of society from repetitious, abortive, and wasteful litigation." 116 *N.J.* at 17–18, 560 *A.*2d 1169 (citation omitted). The entire controversy doctrine's requirement of party joinder is limited to parties with a "material interest" in the suit, *id.* at 26, 560 *A.*2d 1169, that is, parties "that can affect or be affected by the judicial outcome of a legal controversy." *Id.* at 23, 560 *A.*2d 1169. Fairness is thus a protective concept that focuses primarily on whether defendants would be in a better position to defend themselves if the claims against them had been raised and asserted in the first litigation.

■ There is no doubt that defendants are now disadvantaged because they were not parties to the first litigation. Each of the four defendant-doctors were deposed as witnesses during the discovery period in plaintiff's suit against the Hospital. Although they were represented by counsel during these depositions, had they been made parties to the original action, they might have approached the depositions and discovery process differently. 276 *N.J.Super.* at 262, 647 *A.*2d 1318 (Michels, J., dissenting). They would have been able actively to participate in discovery by objecting to interrogatories and requests for documents. Moreover, they would have been able to engage in discovery of their own. Thus, it is clear that their inability to participate as parties in the first trial affects their position in the second, relative to that of the plaintiff, especially in this instance where many of the facts and much of the evidence are the same in both actions.

■ Fairness to the plaintiff must also be considered. The court must be mindful that "as in the case of all other preclusionary doctrines ... the party whose claim is being sought to be barred must have had a fair and reasonable opportunity to have fully litigated that claim in the original action." *Cafferata v. Peyser,* 251 *N.J.Super.* 256, 261, 597 *A.*2d 1101 (App.Div.1991). Thus, the entire controversy doctrine does not apply to unknown

or unaccrued claims. *R.* 4:30A cmt. 2; *Mauro v. Raymark Indus., Inc.,* 116 *N.J.* 126, 138, 561 *A.*2d 257 (1989) (holding that entire controversy doctrine would not bar toxic-tort plaintiff's damage claim because plaintiff discovered existence of disease after first litigation); *Zaromb v. Borucka,* 166 *N.J.Super.* 22, 27, 398 *A.*2d 1308 (App.Div.1979) (holding that slander claim was not precluded by entire controversy doctrine because party was not aware of its existence). *Cogdell* instructs, however, that mandatory joinder is not unfair to a plaintiff where the "plaintiff had sufficient information to have included these defendants in the earlier lawsuit." 116 *N.J.* at 25, 560 *A.*2d 1169.

It is clear that plaintiff was fully aware of the actionable conduct of defendant-doctors when he brought the original suit. Plaintiff contended, and unquestionably knew, that the doctors' conduct led to the Hospital's decision to restrict his promotion to active staff member. Extensive allegations in the complaint in the first proceeding implicated defendant-doctors in the factual basis of plaintiff's claim against the Hospital and its Board of Trustees. As Judge Michels observed,

> The facts pleaded in the second complaint, although couched in terms designed to emphasize the alleged tortious conduct of the doctors, mirror the facts pleaded in the first complaint in all material aspects. The chronology is identical and the entire controversy stems from the recommendation of the doctors in both complaints.
>
> Additionally, only six days passed between the settlement of the first suit and the filing of the complaint in the second suit.... Thus, mandatory joinder of the doctors in the first suit would not have been unfair to plaintiff as plaintiff knew all of the facts and the possible causes of action at the time he initiated the first suit.
>
> [276 *N.J.Super.* at 263–64, 647 *A.*2d 1318.]

Thus, plaintiff had ample opportunity to have fully litigated the claim in the first action; he simply chose not to.

 A derivative aspect to the fairness prong is whether it is fair to preclude the second litigation because the entire controversy doctrine was not followed. A reviewing court could determine in hindsight that a trial court, confronted in the earlier action with an entire controversy application, would have found grounds to excuse joinder. Thus, the need for a single comprehensive

adjudication may be outweighed by the complexity, confusion or unmanageability that might arise from joinder. It is important to emphasize, however, that the joinder determination does not repose with the parties. It is the trial court's responsibility to determine whether or not joinder is appropriate in a given case, and thus litigants should be compelled to bring all actions at one time. *Brown v. Brown*, 208 *N.J.Super.* 372, 381, 506 *A.*2d 29 (App.Div.1986) ("[trial] court, rather than litigant acting unilaterally, must make determination of whether supplementary claim is to be joined or reserved"). The trial court is vested with the discretion to sever or stay an inappropriate consolidation. *See Cogdell, supra*, 116 *N.J.* at 27–28, 560 *A.*2d 1169 ("Any possible unfairness to litigants, confusion in the presentation of issues, administrative unmanageability, or distortion in the truth-determining process that may result from compulsory joinder of parties ... can be eliminated or at least minimized by a trial court possessed of the discretion to excuse joinder or to order severance.") (citing *Crispin, supra*, 96 *N.J.* at 355, 476 *A.*2d 250 (Handler, J., concurring)); *see Crispin, supra*, 96 *N.J.* at 354 n. 3, 476 *A.*2d 250 (Handler, J., concurring) (noting procedural devices available to the trial court to prevent unmanageability, including pre-trial conferences, stipulations of the parties as matters of fact, and utilization of special verdicts to help clarify issues for jury); *Baureis v. Summit Trust Co.*, 280 *N.J.Super.* 154, 163, 654 *A.*2d 1017 (App.Div.1995). A plaintiff's failure to allow the trial court the opportunity to manage the full controversy at the outset diminishes the force of any later claim that joinder would have been inappropriate. *See Petrocelli, supra*, 993 *F.*2d at 31; *Brown, supra*, 208 *N.J.Super.* at 382, 506 *A.*2d 29.

Moreover, plaintiff does not claim unfairness attributable to excusable neglect. Excusable neglect is that carelessness "attributable to an honest mistake that is compatible with due diligence or reasonable prudence." *Mancini v. EDS*, 132 *N.J.* 330, 335, 625 *A.*2d 484 (1993) (citation omitted). Excusable neglect does not encompass ignorance of the law. *Lutz v. Semcer*, 126

*N.J.Super.* 288, 297, 314 *A.*2d 86 (Law Div.1974). Plaintiff already received the equitable relief he requested in the original suit when he was fully aware that he was targeting defendants for another action; he should not now be allowed to manipulate the judicial system to get the monetary damages he could have sought in the first action.

The Appellate Division also observed that plaintiff made no secret of his intention to bring suit against defendants, even before his first suit was filed. 276 *N.J.Super.* at 250, 647 *A.*2d 1318. The implication of that observation is that the doctors knew or should have known during the first lawsuit that plaintiff intended to bring a separate action against them, and, hence, were not "surprised" by that eventuality. In the context of the doctrine of mandatory joinder, however, fairness cannot be equated simply with the absence of surprise. Although the element of "surprise" may indeed be a circumstance relevant to the fairness of allowing a second lawsuit, the absence of surprise does not necessarily make a second action just. Here, the ostensible lack of surprise on the part of defendants does not in any way restore the opportunity that they lost to defend themselves as parties in the first litigation by plaintiff's failure to abide by the entire controversy doctrine.

We note with respect to questions raised by the circumstances of notice or awareness on the part of defendants that the trial court also ruled that defendants are entitled to judgment under *Rule* 4:5–1. That rule states that a party has a continuing obligation during the course of litigation to disclose the names of any other parties who should be joined in the action. The trial court noted that plaintiff had knowledge of the second lawsuit and the identity of the parties at the time his first suit was pending. Consequently, plaintiff "was obligated in his initial certification to include the doctors as contemplated parties. His failure to do so results in a violation of *R.* 4:5–1 and as such, justifies dismissal."

The Appellate Division concluded that the notice provisions of *Rule* 4:5–1 were unnecessary because "here, defendants were or ought to have been fully aware that plaintiff intended filing suit

against them and do not contend that they were unaware of the terms of the settlement of the prior action as they were developing...." *Id.* at 252, 647 *A.2d* 1318. Thus, "the violation of the rules is only technical and imposition of a dismissal sanction is inappropriate." *Id.* at 252–53, 647 *A.2d* 1318. That position, however, fails to recognize that the rule is intended to secure joinder in a current action and to subject joinder issues to the supervisory authority of the court. The rule is not intended simply to notify a new party of the imminence of a future lawsuit.

█ Fairness in the application of the entire controversy doctrine focuses on the litigation posture of the respective parties and whether all of their claims and defenses could be most soundly and appropriately litigated and disposed of in a single comprehensive adjudication. The extensive discovery taken in the first action, especially the depositions taken of the four defendant-doctors concerning their specific conduct and motives regarding plaintiff's staff membership application is not only relevant to the second case, but points to plaintiff's intent to use the information in a later suit against these very doctors. Clearly bringing the suits in one action would have been the fairest course of action and would have enabled the factfinder to determine at one time the responsibility and degree of fault attributable to each party.

## IV

█ The third factor examined in *Cogdell* is the policy that mandatory joinder is appropriate to further "[j]udicial economy and efficiency—the avoidance of waste and delay." *Cogdell,* 116 *N.J.* at 23, 560 *A.2d* 1169. At its most fundamental level inefficiency is "a duplication of lawsuits ... [and] multiple actions each involving the identical controversy and the same witnesses." *Id.* at 26, 560 *A.2d* 1169. Here, plaintiff's second complaint alleges that defendants engaged in arbitrary and capricious conduct in recommending denial of plaintiff's application for active staff membership and in supervising plaintiff. 276 *N.J.Super.* at 264, 647 *A.2d* 1318 (Michels, J. dissenting). The complaint also alleges

libel, slander, malicious and tortious interference with plaintiff's professional and economic relations and prospective economic advantage, intentional infliction of emotional distress, and conspiracy to monopolize the practice of urology at the Hospital in violation of the common law and New Jersey's Anti–Trust Law. *Ibid.* The wrongful conduct of defendants in frustrating plaintiff's promotion is at the heart of all of the tort claims. As pointed out by Judge Michaels, the additional evidence may be required to establish tort liability and damages does not warrant a separate lawsuit, which would, in any event, require the production of substantially the same evidence that would be adduced in the first action. *Id.* at 265, 647 *A.*2d 1318.

Moreover, the consideration of inefficiency and waste of judicial resources is not negated by the fact that a prior action did not proceed to trial or a judgment on the merits. Noting that defendant's first suit had settled within one year and had not required a trial, the Appellate Division emphasized that judicial economy and efficiency is only one consideration and that such concerns cannot override the entire controversy doctrine's overall objective of fairness. *Id.* at 250–52, 647 *A.*2d 1318. Although the weight of the economy factor lessens when a case is dismissed soon after the complaint is filed, here, we are presented with a case that witnessed one year of vigorous pre-trial litigation, including fairly extensive discovery, and involved the respective parties, numerous attorneys and various witnesses before it ultimately settled. More importantly, there is an obvious waste of judicial resources if the second litigation would have been obviated or rendered unnecessary by mandatory joinder.

The concurring opinion below finds substantial the fact that the case was settled. The suggestion is that mandatory joinder may have been premature when the case settled.

> After a lawsuit is filed, as discovery progresses and the contours of a controversy crystallize, a plaintiff often will file amended complaints, stating new claims or joining additional parties. When a plaintiff accepts a settlement offer, this evolutionary process in the pretrial development of a lawsuit terminates. Therefore, the invocation of the single controversy doctrine to bar a plaintiff's subsequent

action against a party who was not joined prior to the settlement of the original action may unfairly preclude a plaintiff from pursuing all claims against all responsible parties. Such an expansive application of the single controversy doctrine also may discourage a plaintiff who conceives that there may be other responsible parties from settling, contrary to this State's firmly established policy of encouraging the settlement of the litigation.

[*Id.* at 254, 647 *A.*2d 1318 (Skillman, J. concurring) (citation omitted).]

That analysis expresses a sound policy but is inapplicable to this case. It does not take into account that, at the time of settlement, these defendants were known to plaintiff not simply as witnesses but as "additional parties," who could have been brought into the action by the filing of an amended complaint. Moreover, the analysis fails to acknowledge that although settlement in the first proceeding may have succeeded in avoiding a costly trial of that action, the courts would still be faced with plaintiff's suit against the doctors. It is unrealistic to suggest that the parties reached a final resolution of the whole controversy by a settlement that now confronts the judicial system with another full-blown lawsuit based on the very same transaction. At best what has been achieved is a partial settlement that fails by a very wide margin to bring litigational peace at once to all of the parties enmeshed in the same controversy.

The concurrence also notes that plaintiff accepted a settlement offer with the understanding that he would be free to bring future claims against individuals not made parties to the original action. *Ibid.* Although a settlement or a dismissal without prejudice is a factor a court should consider when applying the entire controversy doctrine, neither is dispositive in the circumstances of this litigation. These defendants were not parties or privy to the settlement that purported to authorize plaintiff's subsequent lawsuit against them.

## V

We hold that pursuant to the entire controversy doctrine, plaintiff is barred from bringing the second suit. Mandatory joinder is required in this case because the defendant-doctors

named in the second suit had a material interest in the first suit. Their joinder in the first suit would have ensured a comprehensive, just and conclusive disposition of the entire controversy in one legal action. Further, such joinder would have promoted fairness to all parties and avoided duplicative litigation.

The judgment of the Appellate Division is reversed, and plaintiff's complaint is dismissed with prejudice.

*For reversal*—Chief Justice WILENTZ, and Justices HANDLER, GARIBALDI, STEIN, and COLEMAN—5.

*Opposed*—None.