691 A.2d 1384

WILLIAM J. RIEMER, JR., PLAINTIFF–APPELLANT, v. ST. CLARE'S RIVERSIDE MEDICAL CENTER, AND "PAULA POE" AND "SAM SOE" (FICTITIOUSLY NAMED HOSPITAL ADMIN-ISTRATORS), DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued February 5, 1997—Decided April 24, 1997.

104

Before Judges LONG, SKILLMAN and A.A. RODRÍGUEZ.

*Robert A. Vort* argued the cause for appellant.

*Michael J. Gudzij* argued the cause for respondents (*Sachs, Maitlin, Fleming, Greene & Wilson,* attorneys; *Raymond J. Fleming,* of counsel; *Mr. Gudzij,* on the brief).

The opinion of the court was delivered by

LONG, P.J.A.D.

In 1977, the infant-plaintiff, William J. Reimer, Jr., was born at St. Clare's Riverside Medical Center. Ten years after his birth, the infant-plaintiff's parents, individually and on his behalf, filed a medical malpractice complaint against Reza P. Zarkesh, M.D., the obstetrician who handled the delivery. The complaint alleged that the infant's presentation in a double footling breech position warranted performance of a caesarean section and that failure to perform that surgery was malpractice which resulted in injury to the infant. In 1989, that action was voluntarily dismissed because plaintiffs were apparently unable to produce an expert report.

On June 3, 1991, the infant-plaintiff's parents, individually and on his behalf, filed a new complaint against Dr. Zarkesh and fictitiously joined unknown "licensed practicing physicians and/or other health care providers." These defendants allegedly breached their duty

> to render proper diagnostic tests and procedures, failed to carefully & diligently monitor plaintiff pregnancy with infant plaintiff ... and failed to adequately monitor plaintiff's overall obstetrical condition, failed to make themselves available to plaintiff for consultations and treatment, failed to properly advise plaintiff of potential complications of her pregnancy which the defendants knew or should have known of, failed to properly attend her delivery of infant plaintiff ... and used a contraindicated and unreasonably dangerous means of delivering said infant, and the defendants generally failed and neglected to treat and care for plaintiff [mother] in a skillful and knowledgeable fashion according to accepted standards of medical and obstetrical practice.

Dr. Zarkesh moved for summary judgment. The trial judge granted the motion, but only as to the parents' individual claims, and subsequently ordered the guardian ad litem to serve a liability expert report within 30 days. Because no report was timely produced, Dr. Zarkesh again moved for summary judgment dismissing the complaint as to all plaintiffs with prejudice.

Apparently, on February 20, 1992, plaintiffs served Dr. Zarkesh with an expert report prepared by Bernard M. Nathanson, M.D. Dr. Nathanson's report, citing alleged deviations from the standards of practice by Dr. Zarkesh, states in pertinent part:

On page 101 [of his deposition transcript in the previous action] Dr. Zarkesh indicates that he had no time to do a Ceasarean section and that it would take almost an hour to ready an operating room for a Ceasarean section. In that the standard in 1977 for any facility representing itself as offering obstetrical facilities had [sic] to have Ceasarean section capability within 30 minutes, it is clear that either the hospital [i.e., St. Clare's] deviated/departed from the customary standards or Dr. Zarkesh was egregiously incorrect in his opinion that at 9:00 a.m. on a week day morning it would take one hour to set up and start a Cesarean section.[1]

The trial judge granted Dr. Zarkesh's previously filed motion for summary judgment and dismissed plaintiffs' complaint in its entirety, with prejudice, on the basis that the expert report was inadequate to establish that Dr. Zarkesh committed malpractice. On appeal, we reversed the trial judge's dismissal of the infant-plaintiff's claims, but affirmed the dismissal of the parents' claims on the basis that they were time barred under *N.J.S.A.* 2A:14–2. *Riemer v. Zarkesh*, No. A–4043–91 (App. Div. April 23, 1993). The infant-plaintiff's case proceeded.

On October 6, 1993, in response to a subpoena *duces tecum*, St. Clare's advised the infant-plaintiff that it had no written protocols or rules for delivery of infants in a footling breech presentation or for performance of a caesarean section. Dr. Zarkesh thereafter moved to dismiss the infant-plaintiff's complaint for various procedural shortcomings, including the failure to produce Dr. Nathanson for a deposition; to arrange for an examination of plaintiff by a defense medical expert; and, to arrange for depositions of the orthopaedic and pediatric neurology experts. The case then settled, after which a hearing to approve the infant-plaintiff's settlement was held pursuant to *R.* 4:44–3. An order approving a settlement for $525,000 was signed on November 2, 1994.[2]

On January 25, 1995, the infant-plaintiff moved for vacation of the orders of dismissal so that he could amend his complaint to

---

[1] This quotation is taken from the certification of plaintiffs' counsel. We were not provided with a copy of Dr. Nathanson's report.

[2] Additionally, it seems that there were two separate orders of dismissal entered, one as a result of defendant's earlier motion, and the other *sua sponte* by another judge; we have not been provided with copies of these orders.

add the hospital and two fictitious hospital administrators as defendants. The judge denied the motion, stating in a handwritten notation at the bottom of a March 20, 1995 order: "Since none of new parties were named in the original complaint, a new action should be instituted." Approximately five weeks later, on May 1, 1995, the infant-plaintiff instituted the present lawsuit against St. Clare's and its administrators, "Paula Poe" and "Sam Soe."

On January 18, 1996, St. Clare's moved for summary judgment on the basis of the entire controversy doctrine. The judge granted summary judgment and dismissed the infant-plaintiff's claims against the hospital with prejudice. In his ruling, he stated:

> I'm going to grant the Motion for Summary Judgment.... I believe that the entire controversy doctrine does apply to this situation; that at least since 1992 ... the evidence that suggests a cause of action against the hospital was in the possession of the Plaintiff and it wasn't until 1994 that somebody thought, as the case was being settled, that there might be a claim against the hospital.
>
> I would think that that should have been the time that somebody would move to amend the Complaint rather than getting the case fully settled, the whole case concluded, dismissals entered, and then bring the Motion.
>
> ... [T]his was a closed case....And certainly the entire controversy doctrine contemplates that where you know that you have a cause of action against a whole group of people and you—or you should know it because you have a report in hand, that you can't wait and conclude the pending case and then bring a Motion to reopen it.
>
> ....
>
> ... [T]here was knowledge [of a cause of action] and I think the Plaintiffs are charged with knowledge, at least as early as 1992 because that's when the report was available. And I think looking at it in 1994 is too late.

The infant-plaintiff appeals. We reverse.

*Rule* 4:30A, which codifies the entire controversy doctrine, provides:

> Non-joinder of claims or parties required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine, except as otherwise provided by *R.* 4:64–5 (foreclosure actions) and *R.* 4:67–4(a) (leave required for counterclaims or cross-claims in summary actions).

Originally, the doctrine only required joinder of claims arising from "the same overall transaction" involving the parties previously named in the lawsuit. *DiTrolio v. Antiles,* 142 *N.J.* 253, 266,

662 *A.*2d 494 (1995). "The rule has been extended to include all affirmative claims that a party might have against another party, including counterclaims and cross-claims, (citation omitted), as well as joinder of all parties with a material interest in the controversy, *i.e.,* those who can affect or be affected by the judicial outcome of the controversy." *Circle Chevrolet Co. v. Giordano, Halleran & Ciesla,* 142 *N.J.* 280, 289, 662 *A.*2d 509 (1995) (citing. *Cogdell v. Hospital Ctr. at Orange,* 116 *N.J.* 7, 23, 26, 560 *A.*2d 1169 (1989)); *R.* 4:30A.

The entire controversy doctrine embodies an effort to promote the goals of fairness to the parties and fairness to the system of judicial administration, as it requires, to the extent possible, that the adjudication of a legal controversy occur in one litigation and in one court. *Joel v. Morrocco,* 147 *N.J.* 546, 548, 688 *A.*2d 1036 (1997); *Gelber v. The Zito Partnership,* 147 *N.J.* 561, 565, 567, 688 *A.*2d 1044 (1997); *Prevratil v. Mohr,* 145 *N.J.* 180, 187, 678 *A.*2d 243 (1996); *Circle Chevrolet, supra,* 142 *N.J.* at 289, 662 *A.*2d 509; *Cogdell, supra,* 116 *N.J.* at 15, 560 *A.*2d 1169. It also requires that where a party has decided to hold back from an initial lawsuit a related component of the controversy, he should thereafter be barred from raising it in a subsequent proceeding. *Wm. Blanchard Co. v. Beach Concrete Co., Inc.,* 150 *N.J.Super.* 277, 292–93, 375 *A.*2d 675 (App.Div.), *certif. denied,* 75 *N.J.* 528, 384 *A.*2d 507 (1977). Thus, the doctrine mandates that the "parties to a controversy before a court to assert all claims known to them that stem from the same transactional facts, even those against different parties." *Joel v. Morrocco, supra,* 147 *N.J.* at 548, 688 *A.*2d 1036.

Particularly, the objectives sought to be fostered by the doctrine are: "(1) to encourage the comprehensive and conclusive determination of a legal controversy; (2) to achieve party fairness, including both parties before the court as well as prospective parties; and (3) to promote judicial economy and efficiency by avoiding fragmented, multiple and duplicative litigation." *Mystic Isle Dev. Corp. v. Perskie & Nehmad,* 142 *N.J.* 310, 322, 662 *A.*2d

523 (1995); *see also Joel v. Morrocco, supra,* 147 *N.J.* at 548, 688 *A.*2d 1036.

In deciding whether successive claims constitute one controversy for purposes of this doctrine, the focus is on whether the claims arise from related facts or the same transaction or series of transactions. *DiTrolio, supra,* 142 *N.J.* at 267, 662 *A.*2d 494. "It is the core set of facts that provides the link between distinct claims against the same or different parties and triggers the requirement that they be determined in one proceeding." *Id.* at 267–68, 662 *A.*2d 494.

It is well recognized that the entire controversy doctrine does not bar related claims which were unknown, or had not arisen or accrued during the pendency of the original action. *Milkap Corp. v. Industrial Constr. Co., Inc.,* 281 *N.J.Super.* 180, 185–86, 656 *A.*2d 1292 (App.Div.1995); *Fisher v. Yates,* 270 *N.J.Super.* 458, 469–70, 637 *A.*2d 546 (App.Div.1994); *Cafferata v. Peyser,* 251 *N.J.Super.* 256, 260, 597 *A.*2d 1101 (App.Div.1991). "The knowledge of the existence of a cause of action which will invoke the entire controversy doctrine is the same as the knowledge which will trigger the running of the statute of limitations in those cases to which the discovery rule of deferred accrual is applicable." *Circle Chevrolet Co. v. Giordano, Halleran & Ciesla,* 274 *N.J.Super.* 405, 413, 644 *A.*2d 626 (App.Div.1994), *aff'd,* 142 *N.J.* 280, 662 *A.*2d 509 (1995) (quoting *Cafferata, supra,* 251 *N.J.Super.* at 260, 597 *A.*2d 1101). The discovery rule postpones the commencement of a cause of action until a plaintiff knows, or should have known, of facts which establish that an injury has occurred and that fault for that injury can be attributed to another. *Lynch v. Rubacky,* 85 *N.J.* 65, 70, 424 *A.*2d 1169 (1981); *Mystic Isle, supra,* 142 *N.J.* at 326, 662 *A.*2d 523 (where the Court held that a claim accrues for the purposes of the entire controversy doctrine when: "(1) the claimant suffers an injury or damage; and (2) the claimant knows or should know that its injury is attributable to professional negligence").

 The claims against Dr. Zarkesh and St. Clare's arose out of alleged malpractice in the delivery of the infant-plaintiff. The same transaction gave rise to the issue in each case. Indeed, the failure to perform a caesarean section is the issue in both. In terms of discovery of the cause of action against the hospital, as early as February of 1992, the infant-plaintiff's expert, Dr. Nathanson, issued a report which arguably supplied the basis for such a claim (*i.e.*, that the hospital failed to provide caesarean section capability within 30 minutes, which was the standard in 1977). A 1993 response to discovery by St. Clare's acknowledged the absence of any procedures for caesarean sections or footling breech births. As the trial judge correctly found, the infant-plaintiff's counsel was aware or should have been aware in 1992 (and certainly in 1993) that there was a potential claim against the hospital. Yet, he waited until January of 1995, after settling the Zarkesh litigation, to file suit against the hospital in a case which involves entirely duplicative proofs and discovery. This is exactly what the entire controversy doctrine was designed to avoid. Indeed, the facts of this case are nearly identical to those in *Cogdell* in which, after settling with physicians who performed a caesarean section, a plaintiff (on her own behalf and on behalf of her infant) filed a second action against the hospital, members of the operating team and several hospital administrators. *Cogdell, supra,* 116 *N.J.* at 9, 560 *A.*2d 1169. The Court in *Cogdell* specifically interdicted such conduct prospectively.

 Our concern over this case arises in a different context. As the infant-plaintiff correctly points out, "[t]he law is solicitous of infants." *See Zukerman v. Piper Pools, Inc.,* 232 *N.J.Super.* 74, 96, 556 *A.*2d 775 (App.Div.1989); *M. v. K.,* 186 *N.J.Super.* 363, 371, 452 *A.*2d 704 (Ch.Div.1982). That is the reason underlying the legal requirement of judicial approval of an infant settlement by way of a "friendly" hearing. *See R.* 4:44–1 to 4:44–3; *see also R.* 4:48A. By that approval, there is assurance that the infant's interests have been protected and that a settling defendant is afforded some measure of repose. The repose ele-

ment, in itself, is of importance to infant-plaintiffs because, in its absence, "no one will make any settlement of such claims, for fear that it may thereafter be repudiated." *Thompson v. Maxwell Land Grant & Ry. Co.*, 168 *U.S.* 451, 466, 18 *S.Ct.* 121, 126, 42 *L.Ed.* 539, 545 (1897). Once the judge approves the amount and allocation of the settlement figure, the fully represented infant is bound by the settlement just as if he or she was an adult. *See, Ibid.; In re Guardianship of Kelley*, 172 *Ohio St.* 177, 174 *N.E.*2d 244, 247 (1961) ("[i]n the interests of stability and finality and in pursuance of sound policy, a settlement of an injured minor's claim . . . is valid and binding"); *Wheeler v. First Alabama Bank of Birmingham*, 364 *So.*2d 1190, 1200 (Ala.1978) (fully represented minor bound by judgment just like any other party); *Handley v. Mortland*, 54 *Wash.*2d 489, 342 *P.*2d 612, 615 (1959) ("[i]n the absence of fraud or collusion, the compromise of a tort determines with finality all claims, known and unknown, arising therefrom").

 Protection of the infant's interest in this context obviously involves assessment of whether the proffered settlement is commensurate with the settling defendant's liability and, if so, whether it adequately compensates the infant for his past, present and future losses attributable to that defendant. To suggest that this is the sole purpose of the hearing, however, says too little. In our view, judicial approval of an infant settlement is also a vehicle to avoid a settlement which, although fair in itself, could deleteriously affect the infant's ultimate interests in some other way. That said, and given the present existence of the entire controversy doctrine with its potential to extinguish otherwise viable liability claims, it seems to us that it is essential for the judge approving a settlement to inquire of the infant's representatives as to existing but unfiled claims arising out of the same transaction as the litigation being settled. This inquiry should target potentially liable defendants, the claims against whom, though viable, may be lost unless filed while the settled litigation is still pending or otherwise preserved. *Burrell v. Quaranta*, 259 *N.J.Super.* 243, 250, 612 *A.*2d 379 (App.Div.1992). If such viable but unfiled claims

were found to exist, the judge should decline to dismiss the litigation being settled until the new party is impleaded or authorize the filing of a new action after the dismissal of the case before him in the exercise of his judicial discretion. *Prevratil v. Mohr,* 145 *N.J.* 180, 190, 678 *A.*2d 243 (1996); *see also Brown v. Brown,* 208 *N.J.Super.* 372, 382, 506 *A.*2d 29 (App.Div.1986) ("a party whose constituent claim arises during the pendency of the action risks its loss unless he apprises the court and his adversary of its existence and submits to judicial discretion the determination of whether it should be joined in that action or reserved").

So long as the entire controversy doctrine exists in its present form, such a procedure serves its purposes by assuring fairness to all parties, judicial efficiency and the avoidance of piecemeal litigation. At the same time, it carries out the aims underlying the infant settlement approval procedure by looking beyond the four corners of the settlement and assuring preservation of meritorious claims against potentially liable defendants. In so doing, the procedure would avoid exactly the problem presented in this case.

The procedure we have outlined does not appear to have taken place here.[3] In the absence of a showing that this infant-plaintiff was advised of the entire controversy implications of a settlement with Dr. Zarkesh on his outstanding claims against the hospital, we are satisfied that his interests were not adequately protected at the "friendly" and that he should not be barred by the entire controversy doctrine from pursuing those claims. We thus reverse the dismissal of the complaint against St. Clare's as well as the fictitiously named hospital administrators.

---

[3] The transcript of the settlement approval has been lost. However, in view of the fact that no party has suggested that the issue of St. Clare's liability was in any way adverted to during the proceeding, we assume that it was not.