**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1979
_____

UNITED STATES OF AMERICA, ex rel.
JEAN CHARTE

v.

AMERICAN TUTOR, INC.; JAMES WEGELER, JR.;
JAMES WEGELER, SR.; SEAN WEGELER

Jean Charte,
                                    Appellant
_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-10-cv-03318)
District Judge: Hon. Anne E. Thompson
_____

Argued January 15, 2019
_____

Before: AMBRO, HARDIMAN, and FUENTES, *Circuit Judges*.

(Opinion Filed: August 12, 2019

Sean F. Byrnes, Esq. [Argued]
Byrnes O'Hern & Heugle
28 Leroy Place
Red Bank, NJ 07701

    *Counsel for Appellant*

Michael F. Bevacqua, Jr., Esq. [Argued]
Brian M. Block, Esq.
Mandelbaum Salsburg
3 Becker Farm Road
Suite 105
Roseland, NJ 07068

    *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*.

Jean Charte was sued by her former employers in New Jersey state court for defamation, tortious interference with advantageous economic relations, and product disparagement. While that lawsuit was pending, Charte brought this *qui tam*[1]

---

[1] "*Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 769 n.1 (2000). Under the False

action against her former employers on behalf of the United States and the State of New Jersey. As required by the False Claims Act, the *qui tam* action was filed under seal and remained under seal while the United States Government investigated the allegations and decided whether to intervene in the action.[2]

The *qui tam* action remained under seal for over seven years, as the Government considered whether to intervene.[3] During this lengthy seal period, the state court action was dismissed without prejudice after the parties entered into a settlement agreement. Five years later, the Government chose not to intervene in the *qui tam* action, and the District Court unsealed the complaint.[4] Accordingly, pursuant to the False Claims Act, Charte proceeded with the *qui tam* action against her former employers.[5]

---

Claims Act, "a private person, known as a relator, may bring a *qui tam* civil action 'for the person and for the United States Government' against the alleged false claimant, 'in the name of the Government.'" *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1510 (2019) (quoting 31 U.S.C. § 3730(b)(1)).

[2] *See* 31 U.S.C. § 3730(b)(2) (providing that complaints filed by private persons must "be filed in camera" and "remain under seal for at least 60 days").

[3] *See id.* § 3730(b)(3) (stating that the Government "may, for good cause shown, move the court for extensions" of the sixty-day seal period).

[4] *See id.* § 3730(b)(4)(B).

[5] *See id.* § 3730(c)(3).

At the summary judgment stage, the District Court found that the *qui tam* action was barred by New Jersey's equitable entire controversy doctrine and effectively dismissed the complaint. We disagree and conclude that the entire controversy doctrine is inapplicable. For the following reasons, we will vacate the judgment of the District Court and remand for further proceedings.

**I.**

From July 2005 until her termination in September 2007, Jean Charte was employed by American Tutor, Inc. ("American Tutor"), a family-owned corporation that provides tutoring services to school districts in New Jersey and other states. Charte initially worked as a tutor in the Asbury Park School District. The following year, in July 2006, she became a regional district manager. As District Manager, Charte supervised the tutoring services provided by American Tutor to several school districts in New Jersey.

During her time as District Manager, Charte became aware of American Tutor's questionable billing and recruiting practices. In the summer of 2007, she began to express her concerns to James M. Wegeler[6] and Sean Wegeler, brothers who served as officers of American Tutor. That fall, in September 2007, Charte was terminated. Thereafter, Charte contacted the New Jersey Department of Education and the United States Department of Education, among others, and informed them about the practices she had observed while employed by American Tutor.

---

[6] James M. Wegeler was improperly plead in the *qui tam* action as "James Wegeler, Jr." Wegeler Decl. ¶ 1, JA 98.

4

## A. The State Court Action

Nearly one year after Charte's termination, Jim Wegeler, the owner of American Tutor, his son James M. Wegeler,[7] and American Tutor filed a complaint in the Superior Court of New Jersey against Charte and her new employers. The complaint asserted three tort claims against Charte: defamation, tortious interference with advantageous economic relations, and product disparagement.[8] It alleged, *inter alia*, that, after her termination, Charte made "false and defamatory statements to third parties" about Jim Wegeler, his son James M. Wegeler, and American Tutor, "including but not limited to allegations of illegal and unethical business practices."[9] The third parties were identified as American Tutor's business competitors, American Tutor's clients, school district officials, New Jersey Department of Education officials, and United States Department of Education officials.

In January 2009, Charte answered the complaint and asserted several counterclaims, including one for defamation. Over three and a half years later, all parties in the state court action signed an "Agreement Regarding Terms of

---

[7] James M. Wegeler was also improperly plead in the state court action as "James Wegeler, Jr." *Id.* at ¶ 2, JA 98.

[8] The complaint asserted the following claims against Charte's new employers: negligent hiring, negligent retention, and negligent supervision. The complaint also sought to hold the new employers liable for Charte's tortious conduct on a theory of respondeat superior.

[9] JA 26.

5

Dismissal."[10] Under the agreement, Charte and her former employers agreed to dismiss, without prejudice, all claims and counterclaims asserted in the state court action. The next month, in August 2012, the Superior Court of New Jersey dismissed the case pursuant to the agreement.

## B. The Federal *Qui Tam* Action

While the state court litigation was ongoing, in June 2010, Charte filed this *qui tam* action in the District Court against Jim Wegeler, his sons James M. and Sean Wegeler, and American Tutor. She alleged that her former employers violated both the New Jersey and federal False Claims Acts[11] by, *inter alia*, submitting false claims to local school districts in New Jersey for reimbursement of tutoring services.[12] In particular, American Tutor allegedly submitted invoices for payment of "tutoring services that were never received by

---

[10] *Id.* at 67.

[11] *See* 31 U.S.C. § 3729(a)(1); N.J. Stat. Ann. § 2A:32C-3.

[12] Under Title I of the Elementary and Secondary Education Act of 1965, the federal Government provides funding to States for supplemental educational services such as tutoring. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 638 n.22 (2012) (Ginsburg, J., concurring in part and dissenting in part) ("Title I of the Elementary and Secondary Education Act of 1965 provided federal grants to finance supplemental educational programs in school districts with high concentrations of children from low-income families."). States then disburse the federal funding through local boards of education. New Jersey and its local school districts received Title I funding for the purpose of providing supplemental educational services.

6

students" by billing "for students who were absent from tutoring services," and also billing "in numbers in excess of actual students participating" in the tutoring services.[13] Moreover, according to the complaint, the Wegelers "authorized and ratified" the alleged violations of the False Claims Acts.[14]

In accordance with the requirements of the Acts, the *qui tam* action was filed under seal and remained sealed while the Government investigated Charte's claims.[15] During this seal period, Charte could not disclose the existence of the *qui tam* action. As a result, Charte's former employers were unaware that they held two simultaneous roles in different forums: they were plaintiffs in state court and defendants in federal court. It was during this mandatory seal period that the state court action was settled and dismissed.

The *qui tam* action stayed under seal for over seven years—until October 2017,[16] when the District Court

---

[13] JA 54.

[14] *Id.* at 55, 57.

[15] *See* 31 U.S.C. § 3730(b)(2); N.J. Stat. Ann. § 2A:32C-5(c); *see also United States ex rel. Grupp v. DHL Express (USA), Inc.*, 742 F.3d 51, 54 (2d Cir. 2014) (citing *United States ex rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995, 998–99 (2d Cir. 1995)) (explaining that "[t]he purpose of the sealing provisions is to allow the government time to investigate the alleged false claim and to prevent *qui tam* plaintiffs from alerting a putative defendant to possible investigations").

[16] The seal period was so long because Charte consented to (and the Court approved) the Government's repeated requests

7

to extend the initial sixty-day seal period. *See* 31 U.S.C. § 3730(b)(3).

Our dissenting colleague thus correctly notes that American Tutor "spent seven years in the dark about Charte's *qui tam* claim." Dissent Op. 3-4. We nevertheless emphasize that the Government, not Charte, is largely responsible for the length of this case. Notwithstanding Charte's consent to some extensions, most of the seven-year period is directly attributable to the Government. After the District Court gave the Government until February 1, 2013 to decide whether it would intervene, the Government sought, and received, extensions from the Court, this time without Charte's consent. It was not until four and a half years passed, and Charte's motion urging the Government to act, that the Government finally decided not to intervene and the District Court could therefore unseal the complaint.

We note that during the seal period, in June 2016, the Government brought criminal charges against Jim Wegeler, alleging tax evasion, in violation of 26 U.S.C. § 7201, and tax fraud, in violation of 26 U.S.C. § 7206(2). After Wegeler pled guilty to one count of tax evasion and one count of tax fraud, Charte filed a "Motion to Intervene in the Criminal Proceedings for a Limited Reason and for a Relator's Share Award" in the criminal matter and the *qui tam* action before us. JA 20. The District Court denied the motion. Charte's consolidated appeal of that denial is currently pending before our Court.

unsealed the complaint after being notified by the Government of its decision not to intervene.[17] As a result, Charte proceeded as the *qui tam* relator and served the complaint on American Tutor.[18]

In February 2018, American Tutor moved for summary judgment. The next month, pursuant to its unsealing order, the District Court requested the Government's input before ruling on the motion. The Government did not oppose dismissal of the action "should the Court determine that such dismissal is appropriate under the law, so long as such dismissal is without prejudice" to the Government.[19]

The District Court granted summary judgment to American Tutor in April 2018. Describing Charte as "engag[ing] in just the kind of litigation gamesmanship the entire controversy doctrine is designed to prevent," the Court found that, given the circumstances, it was "fundamentally

---

[17] Notwithstanding Charte's allegations under the New Jersey False Claims Act, the record does not address whether the Attorney General of the State of New Jersey also declined to intervene. *See* N.J. Stat. Ann. § 2A:32C-5(d) (requiring the Attorney General to be served with, *inter alia*, a copy of the complaint); *id.* § 2A:32C-5(g) (requiring the Attorney General to "file a pleading with the court" indicating whether he wishes to intervene in the *qui tam* action).

[18] *See* 31 U.S.C. §§ 3730(b)(2), (c)(3). For the sake of brevity, in discussing the *qui tam* action, we will only refer to defendant American Tutor.

[19] JA 124.

fair" to apply the entire controversy doctrine and thus bar the *qui tam* action.[20] Charte now appeals that decision.[21]

## II.

Before addressing the merits of this appeal, we will discuss the statutory background of the False Claims Act and the principles underlying the entire controversy doctrine.[22]

## A.

The False Claims Act imposes civil liability on anyone who "knowingly presents . . . a false or fraudulent claim for payment or approval" to the United States Government.[23] Under the Act, "a private person (the relator) may bring a *qui tam* civil action 'for the person and for the United States Government' against the alleged false claimant, 'in the name of the Government.'"[24] Thus, "[t]he relator's right to recovery

---

[20] *Id.* at 16.

[21] The District Court had jurisdiction under 28 U.S.C. § 1331 and 31 U.S.C. § 3732. We have jurisdiction over this appeal under 28 U.S.C. § 1291. We exercise plenary review over a district court's application of the entire controversy doctrine. *Ricketti v. Barry*, 775 F.3d 611, 613 (3d Cir. 2015).

[22] As we previously acknowledged, Charte asserted claims under both the federal False Claim Act and the New Jersey False Claims Act. For the sake of brevity, we will focus our discussion on the federal False Claims Act.

[23] 31 U.S.C. § 3729(a)(1)(A).

[24] *Vt. Agency of Natural Res.*, 529 U.S. at 769 (quoting 31 U.S.C. § 3730(b)(1)). Accordingly, "[t]he Government may dismiss the action notwithstanding the objections of the

10

exists solely as a mechanism for deterring fraud and returning funds to the federal treasury."[25]

If the Government intervenes, the relator may "continue as a party to the action," but the Government has "the primary responsibility for prosecuting the action."[26] On the other hand, if the Government declines to intervene, as occurred here, the relator has "the right to conduct the action."[27] Notably, notwithstanding its initial decision to not intervene, the Government may subsequently intervene "upon a showing of good cause."[28]

**B.**

The entire controversy doctrine is "essentially New Jersey's specific, and idiosyncratic, application of traditional

person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion." 31 U.S.C. § 3730(c)(2)(A). The Government may also "settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances." *Id.* § 3730(c)(2)(B).

[25] James B. Helmer, Jr., *False Claims Act: Whistleblower Litigation* 1192 (7th ed. 2017) (footnote omitted).

[26] 31 U.S.C. § 3730(c)(1).

[27] *Id.* § 3730(c)(3).

[28] *Id.*

res judicata principles."[29] The doctrine "embodies the principle that the adjudication of a legal controversy should occur in one litigation in only one court; accordingly, all parties involved in a litigation should at the very least present in that proceeding all of their claims and defenses that are related to the underlying controversy."[30] The purposes of the entire controversy doctrine "are threefold: (1) the need for complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay."[31]

In determining whether a claim is barred by the doctrine, a court's "central consideration" is whether the claim "arise[s] from related facts or the same transaction or series of transactions."[32] "It is the core set of facts that provides the link between distinct claims against the same or different parties and triggers the requirement that they be

---

[29] *Rycoline Prod., Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997).

[30] *Cogdell by Cogdell v. Hosp. Ctr. at Orange*, 560 A.2d 1169, 1172 (N.J. 1989); *see Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C.*, 203 A.3d 133, 137 (N.J. 2019) ("The entire controversy doctrine 'seeks to impel litigants to consolidate their claims arising from a single controversy whenever possible.'" (quoting *Thornton v. Potamkin Chevrolet*, 462 A.2d 133, 134 (N.J. 1983))).

[31] *DiTrolio v. Antiles*, 662 A.2d 494, 502 (N.J. 1995); *see Dimitrakopoulos*, 203 A.3d at 143; *Wadeer v. N.J. Mfrs. Ins. Co.*, 110 A.3d 19, 27 (N.J. 2015); *Cogdell*, 560 A.2d at 1173.

[32] *DiTrolio*, 662 A.2d at 502.

determined in one proceeding."[33] Additionally, the entire controversy doctrine applies "only when a prior action based on the same transactional facts has been tried to judgment or settled."[34]

However, the doctrine is "constrained by principles of equity."[35] It remains an equitable rule of preclusion "whose application is left to judicial discretion based on the factual circumstances of individual cases."[36] Accordingly, the entire controversy doctrine's equitable nature "bars its application where to do so would be unfair in the totality of the circumstances and would not promote any of its objectives, namely, the promotion of conclusive determinations, party fairness, and judicial economy and efficiency."[37]

### III.

With the foregoing statutory and equitable framework in mind, we now turn our attention to this case. Here, the factual-nexus requirement of the entire controversy doctrine

---

[33] *Id.*

[34] *Arena v. Borough of Jamesburg*, 706 A.2d 790, 792 (N.J. Super. Ct. App. Div. 1998).

[35] *Dimitrakopoulos*, 203 A.3d at 138.

[36] *Highland Lakes Country Club & Cmty. Ass'n v. Nicastro*, 988 A.2d 90, 91 (N.J. 2009) (quoting *Oliver v. Ambrose*, 705 A.2d 742, 748 (N.J. 1998)).

[37] Pressler & Verniero, *Current N.J. Court Rules*, cmt. 3.2 on R. 4:30A (2019); *see also Wadeer*, 110 A.3d at 27 ("In considering whether application of the doctrine is fair, courts should consider fairness to the court system as a whole, as well as to all parties.").

is satisfied; the state court action and the *qui tam* action both relate to American Tutor's allegedly fraudulent billing practices.[38] Nonetheless, considering the totality of the circumstances, we hold that the entire controversy doctrine does not apply to the instant *qui tam* claims.

To reiterate, we must determine the preclusive effect of the resolution of state tort litigation on a *qui tam* action that was filed while the state action was pending. For three reasons, we are persuaded that preclusion would be unfair to both Charte as the named-party-relator and the Government as the real party in interest.[39]

First, *qui tam* claims belong to the Government, not to relators. Accordingly, the *qui tam* claims in this case do not

---

[38] At oral argument, Charte's counsel attempted to distinguish the facts of the two actions. He asserted that the facts underlying the state court action relate to post-termination defamation, while the facts underlying the *qui tam* action relate to pre-termination events. We are not persuaded by this argument. Moreover, in briefing before the District Court in support of a motion to lift the seal and consolidate the actions, Charte asserted that the two actions "deal with the same set of operative facts." D.C. No. 3-10-cv-03318, ECF No. 7-2 at 1. She explained that her claims "made . . . as a relator for the United States are the same claims that American Tutor alleges to be defamatory" in the state court action. *Id.*

[39] *See United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 930 (2009) (citing Fed. R. Civ. P. 17(a)) (recognizing that the United States Government "is a 'real party in interest' in a case brought under the [False Claims Act]").

14

belong to Charte and did not belong to her when she entered into the settlement agreement. To apply the entire controversy doctrine and hold that the settlement agreement precludes this *qui tam* action would essentially be to endorse the opposite: that the *qui tam* action belonged to Charte and thus, that she could unilaterally negotiate, settle, and dismiss the *qui tam* claims during the Government's investigatory period. Such a decision would not only be unfair to the Government's interests, it would also conflict with the False Claims Act's rule that pending *qui tam* actions may be voluntarily dismissed by relators "only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting."[40]

Second, Charte followed every statutory requirement that applies to *qui tam* relators, including filing the *qui tam* action under seal and not disclosing its existence until ordered to do so by the District Court. It would therefore be a Catch-22 for us to consider her failure to inform American Tutor of the *qui tam* action as weighing in favor of application of the entire controversy doctrine.

Charte tried to litigate this case out in the open. Over the course of six months and *before* settling the state court action, she made two attempts to lift the seal on the *qui tam* action. In January 2012, at a point when the case had been under seal for a year and a half, Charte filed a motion to lift the seal and consolidate the state court action with the *qui tam* action. Three months later, in April 2012, her counsel sent a letter (1) reiterating the request, (2) emphasizing that time was of the essence because American Tutor had moved for

---

[40] 31 U.S.C. § 3730(b)(1).

15

summary judgment in the state court action, and (3) stressing that the seal meant Charte could "make no mention of the pending qui tam case."[41] Charte's hands were tied. It was not until August 2012—over six months after the motion to lift the seal was filed—that the District Court denied the motion. Although Charte settled the state court action before the District Court ruled on her motion to lift the seal and consolidate, the procedural history of the *qui tam* action shows that she took proactive steps to try and avoid that situation. Charte was thus not trying to hide the ball.[42]

Third, and finally, application of the entire controversy doctrine to this case, where the relator was the defendant in a previously filed private suit, would incentivize potential False Claims Act defendants to "smoke out" *qui tam* actions by suing potential relators and then quickly settling those private claims with the sole purpose of subsequently relying on that settlement to bar a *qui tam* action.[43] We decline to give

---

[41] JA 65.

[42] We thus respectfully disagree with our dissenting colleague's conclusion that the District Court's finding that Charte had engaged in litigation gamesmanship "is supported by the record." Dissent Op. 2.

[43] *Cf. United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 474 (5th Cir. 2009) (recognizing the public policy objectives of the False Claims Act and disapproving of possible False Claims Act defendants who "insulate themselves from the reach of the [False Claims Act] by simply forcing potential relators to sign general agreements invoking release and indemnification from future suit").

16

potential defendants a path toward immunizing themselves against False Claims Act liability.

Fairness thus requires that Charte have the opportunity to pursue this *qui tam* action on behalf of the Government.

**IV.**

According to American Tutor, fairness favors preclusion here because Charte could have, and therefore should have, brought the *qui tam* action as a counterclaim in state court. We disagree.

As a preliminary matter, we agree with American Tutor that state courts have concurrent jurisdiction over claims brought under the federal False Claims Act. The statutory language provides that a claim under the Act "may be brought in any judicial district" where a defendant "resides [or], transacts business, or in which any act proscribed by section 3729 occurred."[44] We read the broad term "judicial district" to include state courts.[45] As a result, Charte could have filed the *qui tam* action in state court.

---

[44] 31 U.S.C. § 3732(a).

[45] *Compare id.* (broadly stating that "[a]ny action . . . may be brought in *any judicial district*") *with id.* § 3732(b) (stating that "[t]he *district courts* shall have jurisdiction" over certain cases) (emphases added). *See United States ex rel. Paul v. Parsons, Brinkerhoff, Quade & Douglas, Inc.*, 860 F. Supp. 370, 375 (S.D. Tex. 1994) (concluding that "pursuant to the language of the statute, there is concurrent jurisdiction between the federal and state courts").

However, we are not persuaded that she *had to* bring the *qui tam* claims in state court. Charte's decision to file instead the claims in federal court is not the "deliberate manipulation and forum shopping" of a party who (i) brought a counterclaim in another state, only to (ii) voluntarily dismiss the counterclaim, and (iii) bring the same claim anew in New Jersey.[46] Charte never brought the *qui tam* claims in the state forum, never voluntarily dismissed the claims, and never traveled to a different state to re-litigate the claims.

American Tutor's argument to the contrary ignores a crucial aspect of *qui tam* litigation: *qui tam* claims must remain under seal until the Government decides whether it will intervene.[47] This rule applies in both state and federal courts. Therefore, even if Charte had filed her *qui tam* claims as counterclaims in the state action, American Tutor would have still been unaware of them.[48]

---

[46] *J-M Mfg. Co. v. Phillips & Cohen, LLP*, 129 A.3d 342, 350 (N.J. Super. Ct. App. Div. 2015) (discussing *Archbrook Laguna, LLC v. Marsh*, 997 A.2d 1035 (N.J. Super. Ct. App. Div. 2010)).

[47] *See* 31 U.S.C. §§ 3730(b)(2), (b)(4); *see also* N.J. Stat. Ann. §§ 2A:32C-5(c), (g).

[48] Our dissenting colleague emphasizes that "Charte never alerted the state court . . . to her *qui tam* claim." Dissent Op. 2. This is true. Charte neither filed the *qui tam* action in state court nor informed the state court that she had filed the action in federal court. Nevertheless, had Charte filed the *qui tam* action as a counterclaim in state court, American Tutor would have remained unaware. Additionally, telling the state court about the existence of the federal *qui tam* would have violated the seal, possibly resulting in (1) dismissal, attorney

18

## V.

For the foregoing reasons, we vacate the District Court's grant of summary judgment in favor of American Tutor, and remand for further proceedings.

---

discipline, or monetary penalties, *see State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 137 S. Ct. 436, 444 (2016), and (2) prejudice to the Government by alerting American Tutor of the pending federal investigation.

HARDIMAN, *Circuit Judge*, dissenting.

The entire controversy doctrine is New Jersey's "extremely robust claim preclusion device that requires adversaries to join all possible claims stemming from an event or series of events in one suit." *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 135 (3d Cir. 1999). As my colleagues acknowledge, all of the doctrine's requirements are met in this case. They nevertheless give Appellant Jean Charte a second bite at the apple because of "fairness." I agree that fairness is central to the doctrine, *see Crispin v. Volkswagenwerk, A.G.*, 476 A.2d 250, 253 (N.J. 1984), but that equitable notion is a two-way street and I think the Defendants—who thought they were settling their dispute with Charte—are entitled to repose in this lawsuit. I would affirm the District Court's order.

Central to my evaluation of this appeal is an important finding by the District Court. After giving due consideration to all the facts and procedural history of the case, the trial judge found that by purporting to settle all disputes with Defendants and then seeking to activate this *qui tam* action, Charte had engaged in gamesmanship. *United States ex rel. Charte v. Am. Tutor, Inc.*, 2018 WL 1960448, at *7 (D.N.J. Apr. 26, 2018). I would give that finding the respect it is due. Institutional competence is especially important here, because application of the entire controversy doctrine is "discretionary and clarification of the limits of the doctrine is best left to case-by-case determination." *Rycoline Prod., Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997) (quoting *Circle Chevrolet Co. v. Giordano, Halleran & Ciesla*, 662 A.2d 509, 513 (N.J. 1995)). And the District Court's finding is supported by the record. Charte waited until she had filed her federal *qui tam*

1

suit to make futile requests to "consolidate" the state and federal actions. *Charte*, 2018 WL 1960448, at *1. Then she settled in state court before the District Court had a chance to rule.

Most significantly, Charte never alerted the state court—the court that everyone but she believed was overseeing the entire controversy—to her *qui tam* claim. Perhaps litigating her *qui tam* claim in the state proceeding would've been impractical. Perhaps she believed the state court lacked jurisdiction (as the Majority holds today, it did not). But those considerations were for the court, not Charte, to weigh. *See Petrocelli v. Daniel Woodhead Co.*, 993 F.2d 27, 31 (3d Cir. 1993). Charte's "failure to allow the trial court the opportunity to manage the full controversy at the outset," *DiTrolio v. Antiles*, 662 A.2d 494, 506 (N.J. 1995), saps her impracticability argument of force and suggests strategic behavior.[1]

---

[1] The Majority contends that, by virtue of the seal, the Defendants would have been unaware of Charte's *qui tam* claim regardless whether she filed in state court or federal court. That is true as far as it goes. But alerting the state court *ex parte* (before filing in either federal or state court) would have given it the opportunity to ensure a fair adjudication of the entire controversy. *Cf. Gelber v. Zito P'ship*, 688 A.2d 1044, 1046 (N.J. 1997) ("Quite aside from joinder of the controversies in either the arbitral or judicial forum, a trial court, once informed of related actions, can employ various procedural tools to prevent excessively complicated or unfair litigation."). For example, the court might have required the Government to make its intervention decision sooner.

The Majority argues that Charte "followed every statutory requirement that applies to *qui tam* relators," so it would be unfair to apply the entire controversy doctrine. Maj. Op. 15. But state court judgments "may well deprive plaintiffs of the 'right' to have their federal claims relitigated in federal court." *San Remo Hotel, L.P. v. City & Cty. of San Francisco*, 545 U.S. 323, 342 (2005). Charte's right to litigate her *qui tam* suit in federal court does not imply a right to settle the same controversy in state court while evading normal preclusion principles.

The Majority emphasizes that holding Charte precluded would be "unfair to the Government's interests." Maj. Op. 15; *see id.* at 17. Yet the Government consented to the District Court's disposition of this case and the Government is in the best position to decide whether Charte's suit would or would not vindicate its interests. And, contrary to the Majority's view, Maj. Op. 14–15, there is little reason to think the Government would be precluded by the entire controversy doctrine just because Charte is. *See Cogdell by Cogdell v. Hosp. Ctr. at Orange*, 560 A.2d 1169, 1174 (N.J. 1989) (the entire controversy doctrine "tries foremost to protect an absent person from an adjudication of his or her interests"); *cf. United States ex rel. Vaughn v. United Biologics, L.L.C.*, 907 F.3d 187, 194 (5th Cir. 2018) ("[T]he Government should not be bound if the dismissal is for reasons not tied to the underlying legal merit.").

For all the procedural brainteasers *qui tam* preclusion might offer in other cases, this case is straightforward. The Defendants spent seven years in the dark about Charte's *qui*

3

*tam* claim.[2] For five of those years, they thought this dispute was behind them. Charte kept the state court in the dark too. The Supreme Court has observed of statutes of limitations that their "conclusive effects are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared . . . . [T]he right to be free of stale claims in time comes to prevail over the right to prosecute them." *Order of R.R. Telegraphers v. Ry. Express Agency*, 321 U.S. 342, 348–49 (1944). Fairness dictates the application of that same principle here.

\*     \*     \*

"[A]t some point litigation over the particular controversy [must] come to an end." *Mystic Isle Dev. Corp. v. Perskie & Nehmad*, 662 A.2d 523, 534 (N.J. 1995) (quoting Restatement (Second) of Judgments § 19 cmt. a (1982)). For these litigants, that point has long since passed. With respect, I dissent.

---

[2] My colleagues correctly note that much of this delay was attributable to the Government's requests for extensions, only some of which Charte consented to. But Charte did not try to force the Government's hand until August 2017. I acknowledge Charte was not in the driver's seat before the Government declined to intervene, but it was her decision to settle with Defendants while holding another claim in reserve.

4