**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3011-18

HOME INSURANCE COMPANY,

    Plaintiff,

v.

CORNELL-DUBILIER
ELECTRONICS, INC., FEDERAL
PACIFIC ELECTRIC COMPANY,
AETNA CASUALTY & SURETY
COMPANY, AIU INSURANCE
COMPANY, AMERICAN
CENTENNIAL INSURANCE
COMPANY, AMERICAN
INSURANCE COMPANY,
AMERICAN INTERNATIONAL
INSURANCE COMPANY,
AMERICAN MOTORISTS
INSURANCE COMPANY,
CALIFORNIA UNION
INSURANCE COMPANY,
COLUMBIA CASUALTY
COMPANY, CONTINENTAL
CASUALTY INSURANCE
COMPANY, EMPLOYERS
MUTUAL CASUALTY
COMPANY, FIREMAN'S FUND
INSURANCE COMPANY, FIRST
STATE INSURANCE COMPANY,

GRANITE STATE INSURANCE
COMPANY, HARTFORD
ACCIDENT & INDEMNITY
COMPANY, HIGHLANDS
INSURANCE COMPANY,
INTERNATIONAL SURPLUS
LINES INSURANCE COMPANY,
LEXINGTON
INSURANCE COMPANY,
LIBERTY MUTUAL INSURANCE
COMPANY, CERTAIN
UNDERWRITERS AT LLOYDS
OF LONDON, LUMBERMAN'S
MUTUAL CASUALTY
COMPANY, MIDLAND
INSURANCE COMPANY,
NORTH RIVER INSURANCE
COMPANY, NORTHWESTERN
NATIONAL INSURANCE
COMPANY, PRUDENTIAL
REINSURANCE COMPANY,
PURITAN INSURANCE
COMPANY, TRANSIT
CASUALTY COMPANY,
WRENFORD INSURANCE
COMPANY,

  Defendants,

and

EXXON MOBIL CORPORATION,

  Intervenor-Respondent.
_____

CORNELL-DUBILIER
ELECTRONICS, INC. and

2

FEDERAL PACIFIC ELECTRIC
COMPANY,

      Plaintiffs,

v.

COLUMBIA CASUALTY
COMPANY and CONTINENTAL
CASUALTY COMPANY,

      Defendants.

_____

Argued January 5, 2021 – Decided June 23. 2021

Before Judges Yannotti, Mawla and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket Nos. L-5192-96, L-2773-02, and L-0463-05.

John C. Sullivan argued the cause for appellant Appearing London Market Insurers (Clyde & Co. US LLP, Post & Schell, PC, Mendes & Mount, LLP, and Mary Ann D'Amato (Mendes & Mount, LLP) of the New York bar, admitted pro hac vice, attorneys; John C. Sullivan, Daren S. McNally, Rebecca S. Bardach, Daniel J. Wityk and Mary Ann D'Amato on the briefs).

John M. Toriello argued the cause for intervenor-respondent (Holland & Knight LLP, attorneys; John M. Toriello, Marisa Marinelli, Daniel K. Winters and Stosh M. Silivos, on the brief).

PER CURIAM

A-3011-18

At issue in this appeal is the applicability of an indemnification provision contained in a settlement agreement and the appropriate forum to resolve that dispute. Intervenor-defendant Exxon Mobil Corporation (Exxon) agreed to indemnify certain London Market insurers, including entities referred to collectively by the parties as defendant Appearing London Market Insurers (ALMI), that issued policies to Exxon between 1980 and 1983.

Exxon intervened in a pending New Jersey declaratory judgment action involving Cornell-Dubilier Electronics, Inc. (CDE), its former indirect subsidiary, that addressed insurance coverage claims with regard to CDE's environmental liabilities. ALMI moved to dismiss Exxon's claims in favor of a New York City forum, in accordance with the settlement agreement's forum selection clause. Exxon opposed the motion and maintained, among other reasons, that enforcement of the forum selection clause would violate New Jersey public policy as expressed in the entire controversy doctrine. In a May 18, 2011 Law Division order, the court agreed with Exxon and denied ALMI's motion.

Exxon further argued, based on the unique circumstances presented, any indemnification it owed ALMI was extinguished based on ALMI's failure to

tender its indemnity claim in a timely fashion.  Exxon also argued it was entitled to reimbursement of its attorneys' fees.

ALMI maintained that excusing Exxon's indemnification obligation would violate the terms of the settlement agreement and governing New York law.  In a December 15, 2017 order, the court disagreed with ALMI and granted Exxon summary judgment and attorneys' fees.  ALMI filed a motion for reconsideration, which the court denied in a February 2, 2018 order.  On appeal, ALMI challenges portions of the court's May 18, 2011, December 15, 2017, and February 2, 2018, orders and January 31, 2019 final judgment.

We affirm in part and vacate and remand in part.  We affirm those portions of the court's May 18, 2011 order in which the court denied ALMI's motion to dismiss the New Jersey litigation based on the settlement agreement's forum selection clause, and its December 15, 2017 order granting Exxon summary judgment.  We also affirm the court's February 2, 2018 order denying ALMI's motion for reconsideration.

We vacate, however, the court's December 15, 2017 and January 31, 2019 orders to the extent that they awarded Exxon attorneys' fees, as the court failed to explain specifically the legal and factual bases for such an award.  We

accordingly remand for the court to make appropriate findings of fact and conclusions of law on that limited issue.

## I.

We distill the relevant facts from the trial court proceedings that have spanned over twenty-four years.  Between 1980 and 1983, CDE was an indirect subsidiary of Exxon.  During this period, multiple subscribing insurers,[1] including ALMI, issued liability policies to Exxon and, in accordance with the policies' terms and conditions, CDE.

---

[1]  As described by the Fifth Circuit:

> Lloyds [sic] of London is not an insurance company but rather a self-regulating entity which operates and controls an insurance market. . . .
>
> The members or investors who collectively make up Lloyd's are called "Names" . . . .   Names are underwriters of Lloyd's insurance and they invest in a percentage of the policy risk in the hope of making return on their investment. . . .  Each Name is exposed to unlimited personal liability for his proportionate share of the loss on a particular policy that the Name has subscribed to as an underwriter.  Typically hundreds of Names will subscribe to a single policy, and the liability among the Names is several, not joint.
>
> [Corfield v. Dallas Glen Hills LP, 355 F.3d 853, 857-58 (5th Cir. 2003) (citations omitted).]

A-3011-18

In February 1992, the New Jersey Department of Environmental Protection (DEP) issued a directive and notice to insurers advising CDE of potential liability related to its release of hazardous materials at its twenty-six-acre manufacturing facility in South Plainfield, which it operated from approximately 1932 to 1962. The following month, CDE sent a letter to its London Market insurers, including ALMI, "claim[ing] coverage . . . under all other policies which [were] issued on [CDE's] behalf, even if not specifically listed." In 1994, the United States Environmental Protection Agency (EPA) became involved with assessing the environmental impact at the South Plainfield site.

On December 19, 1996, Home Insurance Company filed a complaint against CDE, its direct parent company, and thirty of CDE's insurers. The complaint sought a declaratory judgment adjudicating the rights and obligations of the parties as to various environmental liability claims against CDE, including those associated with its South Plainfield facility. Sixteen insurance companies appeared in the action collectively as "London Market Insurers." ALMI was included among the London Market Insurers. Exxon, however, was not named in this suit.

A-3011-18

CDE filed a cross-claim in October 1998 against certain of the defendant insurers and sought a declaration of those insurers' obligations "under [its] policies issued to CDE," noting it provided notice of the environmental liability claim with its 1992 letter. In May 1999, CDE propounded discovery requests upon ALMI requesting, among other information, identification and production of "all liability insurance policies issued by [ALMI] at any time in which . . . CDE . . . was a named insured, an additional insured, or otherwise a covered party (such as a shareholder or subsidiary)." ALMI responded in April 2001, identifying eleven policies, none of which included policies it issued to Exxon and which covered CDE.

In June 2000, Exxon, ALMI, and certain other insurers who issued liability policies to Exxon, entered into a settlement agreement that resolved an unrelated environmental enforcement action. The insurers, including ALMI, paid Exxon a settlement amount and Exxon, in exchange, released ALMI in Paragraph 3.1 of the agreement from all claims for coverage under their policies in connection with environmental liability "to assure [ALMI] their peace and freedom from such claims."

Central to the issues before us, in Paragraph 4.1, Exxon agreed to:

> [D]efend, indemnify, save, and hold harmless
> [ALMI] . . . from and against all claims, including

8

claims for indemnity, defense, subrogation, reimbursement, and/or contribution arising out of the [policies] and relating to [environmental liability] asserted by . . . any former [subsidiary] or [affiliate of Exxon].

Paragraph 4.2 also required the parties to act in good faith "in responding to and defending against such claims," and in Paragraph 4.3 the parties agreed that:

In connection with such defense, [Exxon] shall give written notice to [ALMI] of the identity of defense counsel. Absent good cause, [ALMI] shall agree to the counsel chosen by [Exxon], which counsel shall indicate in all pleadings and court filings that it is acting on behalf of [Exxon] as the indemnitor of [ALMI] and therefore, the positions taken are not necessarily those of [ALMI]. [ALMI] may assume control of their own defense by providing to [Exxon] written notice of such intention, in which case, all subsequent costs associated with the defense of the proceeding or litigation shall be borne by [ALMI].

Under Paragraph 10.1, the parties agreed that, in the event a dispute arose out of the settlement agreement or the insurance policies, they "may mutually agree to resolve said disputes through binding arbitration." If the parties elected to file in court, however, they consented in Paragraph 10.2 that any action would be venued in a New York City court and that the substantive law of the State of New York would apply.

9

Unable to resolve the insurance coverage dispute regarding the environmental liabilities relating to the South Plainfield site, CDE and ALMI proceeded to a bench trial on February 18, 2004. Exxon was still not named in the action.

After considering the testimony and extensive documentary evidence, Judge Jack M. Sabatino determined that the relevant insurance policies issued by ALMI and other insurers covered the environmental harm that occurred at the site. The litigation then turned to the "allocation phase" in which "issues of exhaustion and/or triggered insurance policies" would be resolved.

In late 2008, ALMI's expert produced a report that for the first time referenced the Exxon policies and which ALMI later produced at CDE's request. CDE filed a motion for sanctions against ALMI for its failure to produce those policies in response to its original discovery requests in May 1999.

In a June 23, 2009 written decision, Judge Andrew J. Smithson found that although ALMI did not have "a design to mislead," it "knew that CDE . . . [was a] subsidiar[y] of Exxon," CDE "clearly requested all liability policies" issued by ALMI in which CDE was a subsidiary, and ALMI "knew that a search for policies applicable to CDE . . . would only uncover policies under which CDE . . . w[as] '[n]amed [i]nsureds.'" He concluded ALMI "intentionally fail[ed] to

diligently engage in discovery." In a corresponding order, Judge Smithson imposed on ALMI "the cost of all discovery arising as a result of the production of the Exxon policies."

CDE also informed ALMI in November 2008 that it was specifically asserting coverage for the South Plainfield site under the Exxon policies. In a March 2009 letter to Exxon, ALMI tendered the defense of CDE's claim to Exxon pursuant to Paragraph 4.1 of the settlement agreement. In May 2010, after initially disputing the tender, Exxon accepted the defense under a reservation of rights and noted it would provide a defense pursuant to Paragraph 4.3 of the settlement agreement.

Exxon then sought to intervene in the New Jersey litigation as a named party, which a different motion judge granted on September 10, 2010. Exxon immediately moved to compel arbitration, an application the court denied after concluding that Exxon's request was untimely. The court also granted, in part, CDE's motion for summary judgment finding that Exxon's insurance policies covered CDE.

In November 2010, Exxon filed a cross-claim against ALMI seeking a determination that it was excused from its obligations to indemnify ALMI under the settlement agreement because of ALMI's delayed tender of CDE's coverage

claim and its express and implied breaches of the covenants of good faith and fair dealing. ALMI opposed Exxon's application and filed a cross-claim to dismiss based on the settlement agreement's forum selection clause.

In a May 18, 2011 order, the court denied ALMI's motion to dismiss. In an oral decision issued that day, it declined to enforce the forum selection clause reasoning that although the clause in the settlement agreement demonstrated the parties' intention to select New York City as the forum to resolve any dispute, that intent had "to be balanced against the entire controversy doctrine."

The court explained that it did not even "seem to be a close call, that in order for there to be a comprehensive and conclusive determination in this case, the issue of the 2000 settlement agreement need[ed] to be in this case," and to have it "go to New York would result in piecemeal litigation, and not be in the interest of judicial efficiency." ALMI thereafter asserted a cross-claim for indemnification against Exxon.

In October 2014, CDE entered a consent decree with the EPA and the State of New Jersey stipulating that it was responsible for the environmental damage and cleanup costs at the South Plainfield site. CDE further agreed to use its "best efforts . . . to maximize [all of its] [i]nsurance [p]roceeds" to address the remediation. In October 2016, CDE, Exxon, and ALMI entered into a

settlement agreement resolving CDE's claims under the Exxon policies. The settlement agreement did not address Exxon and ALMI's cross-claims.

Exxon and ALMI accordingly filed summary judgment motions on their competing cross-claims. On December 15, 2017, the court granted Exxon's application for summary judgment, and denied ALMI's cross-motion.

In an oral decision, the court initially concluded that under New York common law as expressed in American Export Isbrandsten Lines v. U.S., 390 F. Supp. 63 (S.D.N.Y. 1975), "the conduct by the indemnitee which prejudices the right of the indemnitor, discharges the indemnitor." The court explained that this common law rule is "not conditioned on an indemnity breach [or an] express[] contract" and that it was not necessary to establish a tangible economic harm. The court also noted that the "indemnitee does have a duty to act reasonably under all the circumstances to protect the indemnitor against liability." It found that it was ALMI's "burden to show those rights or defenses would not have impacted the underlying claim" with "absolute assurance."

The court concluded Exxon had shown prejudice "by being denied the opportunity to participate in the proceedings for a significant period of time." It found Exxon did not have to show the outcome would have been different but that it was not "able to play a meaningful role" in the proceedings. The court

13

acknowledged that the settlement agreement's indemnification provision did not state that Exxon had the "sole right" to defend but found that the provision's language under Paragraphs 4.1 and 4.3 showed it was "clear that they do have the right to control the defense."

The court also reasoned that CDE made "broad claims" in 1992 and 1998 against the Exxon policies and that the policies were not part of the trial in 2004 because ALMI breached its discovery obligation. It found that Judge Smithson's findings that ALMI "intentionally failed to diligently engage in discovery" were "dispositive" on that point. That discovery violation, the court concluded, "resulted in the material deprivation of Exxon's rights to consult in [and control] the defense," which included the "arbitration provision, the litigation occurrence, . . . [the] exclusion defenses, and tak[ing] advantage of early settlement opportunities."

The court distinguished ALMI's reliance on Unigard Sec. Ins. v. N. River Ins., 4 F.3d 1049, 1068-69 (2d Cir. 1993) (Unigard II), because unlike the reinsurer's rights and obligations addressed in that case, Exxon's right to control was "more significant than a reinsurer's right to associate."[2] Rather, relying on

_____

[2] "Reinsurance is the insurance of one insurer (the reinsured) by another insurer (the reinsurer) by means of which the reinsured is indemnified for loss under

<u>Conergics Corp. v. Dearborn Mid-West Conveyor Co.</u>, 144 A.D.3d 516 (N.Y. App. Div. 2016), the court concluded ALMI "breached the indemnity agreement, and [that] those breaches were both material and prejudicial" because Exxon lost the right to control the defense.

Although the court concluded ALMI's late notice prejudiced Exxon, it further found Exxon was not required to establish prejudice associated with ALMI's late notice.[3]  The court reasoned that ALMI's "failure to give time[ly] notice in and of itself discharge[d] Exxon of its indemnity obligation."  It noted the agreement's "lack of an express notice provision [was] not dispositive" because Exxon could not exercise its right to control the defense without notice.  As a result, the court found notice was "integrated into the agreement" and that it was "an implied condition."  (citing <u>Greater N.Y. Mutual Ins. v. Farrauto</u>, 136 A.D.2d 598 (N.Y. App. Div. 1988)).  The court reasoned the "duty to give

---

insurance policies issued by the reinsured to the public."  <u>In re Union Indem. Ins. of N.Y.</u>, 674 N.E.2d 313, 319 (N.Y. 1996) (internal quotation marks and citation omitted).

[3]  Referred to as the no-prejudice rule, New York courts have recognized a "limited exception" to a required showing of actual prejudice when notice is a condition precedent.  <u>Am. Home Assur. Co. v. Int'l Ins.</u>, 684 N.E.2d 14, 16 (N.Y. 1997).

<span>A-3011-18</span>

reasonable notice as a condition precedent to recovery is implied in insurance contracts."

Finally, the court agreed with Exxon that ALMI breached the covenant of good faith and fair dealing. The court reasoned that Judge Smithson had sanctioned ALMI for intentionally failing to engage in discovery and that violation led to "significant delay" and "prejudice."

In its corresponding order, the court ordered ALMI to "reimburse Exxon for litigation expenses and costs incurred in defending . . . ALMI [from] CDE's claims against the Exxon policies." On January 8, 2018, ALMI filed a motion for reconsideration, which the court denied without oral argument in a February 2, 2018 order, and without an accompanying statement of reasons.

After the court ordered reimbursement and denied reconsideration, the parties agreed in a January 30, 2018 stipulation and order that judgment in the amount of $7.8 million should be entered against ALMI "for Exxon's litigation expenses and costs incurred in the defense of CDE's claims against the Exxon policies, subject to [ALMI's] appellate rights."[4] The court issued final judgment

---

[4] The parties did not include a copy of the January 30, 2018 stipulation and order in the record.

on January 31, 2019, certified as a final order under <u>Rule</u> 4:42-2. This appeal followed.

On appeal, ALMI first contends that the court erred by denying its motion to dismiss and effectively overriding the settlement agreement's forum selection clause. Second, it maintains the court erred in granting Exxon's motion for summary judgment. ALMI argues the court misapplied New York law and that its actions in tendering the indemnification claim did not excuse Exxon's obligations under the settlement agreement. Finally, it contends the court failed to provide a sufficient basis to grant Exxon attorneys' fees or deny its motion for reconsideration. We address each of ALMI's arguments seriatim.

II.

ALMI argues the court's May 18, 2011 order denying its motion to dismiss Exxon's cross-claim was erroneous as the parties agreed that any dispute regarding the scope and applicability of the indemnification provision would be litigated in a New York City court. ALMI contends the court erred when it relied on the entire controversy doctrine to set aside the forum selection clause in the settlement agreement because its claims against Exxon "involve separate sets of contracts and separate legal duties." We disagree.

A forum selection clause's enforceability presents a legal issue and, thus, is an issue we review de novo.  Hoffman v. Supplements Togo Mgmt., L.L.C., 419 N.J. Super. 596, 605 (App. Div. 2011); see also Salovaara v. Jackson Nat'l Life Ins., 246 F.3d 289, 295 (3d Cir. 2001) (explaining the "interpretation and enforcement of a forum selection clause is a matter of law" subject to plenary review).  The "trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995).

"[F]orum selection clauses are prima facie valid and enforceable in New Jersey."  Caspi v. Microsoft Network, L.L.C., 323 N.J. Super. 118, 122 (App. Div. 1999) (citation omitted).  However, we have declined to enforce a forum-selection clause if:  "(1) the clause is a result of fraud or 'overweening' bargaining power; (2) enforcement would violate the strong public policy of New Jersey; or (3) enforcement would seriously inconvenience trial."  Paradise Enters., Ltd. v. Sapir, 356 N.J. Super. 96, 103 (App. Div. 2002) (quoting Caspi, 323 N.J. Super. at 122).

New Jersey courts have declined to enforce forum selection clauses that violate public policy on several occasions.  See Kubis & Perszyk Assocs., Inc. v. Sun Microsystems, Inc., 146 N.J. 176, 192-93, 195 (1996) (holding "forum-

selection clauses in contracts subject to the Franchise Act," N.J.S.A. 56:10-1 to -31, "are presumptively invalid" because "general enforcement" of those clauses would "substantially circumvent the public policy underlying the Franchise Act"); McNeill v. Zoref, 297 N.J. Super. 213, 222-24 (App. Div. 1997) (declining to enforce a forum selection clause in a mortgage brokerage services agreement when enforcement would be contrary to "the strong public policy . . . found in the entire controversy doctrine which is firmly entrenched in this State" (citations omitted)); Param Petroleum Corp. v. Com. & Indus. Ins., 296 N.J. Super. 164, 170-71 (App. Div. 1997) (refusing to give effect to a forum selection clause in an insurance policy when the insured property was located in New Jersey and enforcement of the clause would violate the policy that the location of the insured risk should determine the forum).

The entire controversy doctrine, codified in Rule 4:30A, "embodies the principle that the adjudication of a legal controversy should occur in one litigation in only one court" and requires all parties to "present in that proceeding all of their claims and defenses that are related to the underlying controversy." Bank Leumi USA v. Kloss, 243 N.J. 218, 228 (2020) (quoting Wadeer v. N.J. Mfrs. Ins., 220 N.J. 591, 605 (2015)); see also Kent Motor Cars, Inc. v. Reynolds & Reynolds, Co., 207 N.J. 428, 443 (2011) (noting that the doctrine finds its

support in our State Constitution and the goal "that all matters in controversy between the parties may be completely determined" (quoting N.J. Const. art. VI, § III, ¶ 4)); Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 4:30A (2021).

The entire controversy doctrine represents the "long-held preference that related claims and matters arising among related parties be adjudicated together rather than in separate, successive, fragmented, or piecemeal litigation." Kent Motor Cars, 207 N.J. at 443. "The doctrine has three fundamental purposes: '(1) the need for complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay.'" Bank Leumi, 243 N.J. at 228 (quoting DiTrolio v. Antiles, 142 N.J. 253, 267 (1995)).

When deciding whether multiple claims must be asserted in the same action, the court's "initial inquiry is whether they 'arise from related facts or the same transaction or series of transactions.'" Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 109 (2019) (quoting DiTrolio, 142 N.J. at 267). "The doctrine does not mandate that successive claims share common legal issues in order for the doctrine to bar a subsequent

action." Ibid. Rather, "the determinative consideration is whether distinct claims are aspects of a single larger controversy because they arise from interrelated facts." Ibid. (quoting DiTrolio, 142 N.J. at 271).

"However, where claims are 'separate and discrete' from those in the initial proceeding, the mandatory joinder of claims does not bar the subsequent action." Allstate N.J. Ins. v. Cherry Hill Pain & Rehab. Inst., 389 N.J. Super. 130, 140 (App. Div. 2006) (quoting Hillsborough Twp. Bd. of Educ. v. Faridy Thorne Frayta, P.C., 321 N.J. Super. 275, 285 (App. Div. 1999)). If the parties have "a significant interest in the disposition of a particular claim, one that may materially affect or be materially affected by the disposition of that claim," then the distinct claims are part of an entire controversy. DiTrolio, 142 N.J. at 268. The test for whether the claims are related in such a way that they must be brought under a single action is:

> [I]f parties or persons will, after final judgment is entered, be likely to have to engage in additional litigation to conclusively dispose of their respective bundles of rights and liabilities that derive from a single transaction or related series of transactions, [then] the omitted components of the dispute or controversy must be regarded as constituting an element of one mandatory unit of litigation.
>
> [Ibid.]

Here, we conclude ALMI's actions, or more precisely inactions, contravened the significant public policy considerations underlying the entire controversy doctrine, thereby fully supporting the court's decision. Exxon and ALMI's dispute regarding the applicability of the indemnification provision was inextricably connected to CDE's coverage claim. As ALMI acknowledged in its merits brief before us, "[its] claim for indemnification against Exxon is predicated on the fact that CDE pursued claims against ALMI in New Jersey."

This is not a situation in which Exxon's indemnification obligations are "separate and discrete," Allstate N.J. Ins., 389 N.J. Super. at 140, as it is not a case where there would be "no replication of proofs," but rather would require a trial court to "retrac[e] ground that had already been covered." Hillsborough Twp., 321 N.J. Super. at 286. Indeed, the relevant claims and defenses require a comprehensive review and consideration of ALMI and Exxon's actions throughout the course of the wider dispute over environmental liability regarding the South Plainfield site. At bottom, these claims and defenses arise from the same "series of transactions." DiTrolio, 142 N.J. at 268.

Although we recognize our courts' general deference to the parties' choice of forum, the unique facts here support the court's refusal to enforce that provision. The court's decision properly considered New Jersey public policy

22

as expressed in the entire controversy doctrine, and that doctrine's fundamental purposes of fairness and judicial efficiency. As discussed infra, ALMI's inexplicable delay in notifying Exxon caused it harm by preventing its timely participation as an indemnitor. The protracted and multifaceted nature of the litigation involving CDE, ALMI, and other non-appealing underwriter intervenors, had spanned years and was still ongoing when Exxon became involved in the action. To enforce the forum clause would result in the duplicity of litigation and violate our state's public policy.[5]

When ALMI moved to dismiss Exxon's claim, seven years after its bench trial, CDE had yet to resolve its claims for coverage under the Exxon policies. Thus, the practical effect of enforcing the parties' forum selection clause would have been to require Exxon to adjudicate CDE's coverage claims in New Jersey, and litigate its claims under the settlement agreement in New York. As noted by the court, such an outcome would violate the "long-held preference," Kent Motor Cars, 207 N.J. at 443, to adjudicate related claims together as it would

---

[5] Further demonstrating the intertwined facts between the CDE litigation and the claims in this matter, as well as support for avoiding piecemeal decisions, is the involvement and actions of additional underwriters who had been involved in the CDE litigation, but did not initially appear in this action. Those underwriters intervened in this matter, asserted the same indemnification-related crossclaims as ALMI, and have not appealed the final judgment entered in this case.

result in improper fragmentation of litigation involving common facts and parties contrary to the fundamental goals of fairness and efficiency.

## III.

ALMI further argues that the court erred in granting Exxon's motion for summary judgment. Specifically, it argues the court erred in concluding ALMI's actions: 1) actually prejudiced Exxon, 2) violated the no-prejudice rule, 3) breached the covenant of good faith and fair dealing, and 4) contravened common law principles as expressed in American Export, 390 F. Supp. 63.[6] We disagree with ALMI's first three points and conclude, to the extent the court relied on American Export, any error does not warrant reversal of the court's December 15, 2017 order.

At the outset, we note that although the settlement agreement at issue is to be interpreted under New York law in accordance with the parties' choice-of-law provision, the disposition of a summary judgment motion is governed by the

---

[6] ALMI contends the court erred in relying on American Export for the proposition that it must establish with "absolute assurance" that Exxon was not prejudiced by late notice. ALMI argues, citing CIH Int'l Holdings v. BT U.S., LLC, 821 F. Supp. 2d 604, 612 (S.D.N.Y. 2011), that New York law requires a plaintiff, not defendant, to establish that a breach caused prejudice. ALMI further points out that neither American Export, a federal maritime dispute, nor any subsequent New York case established an "absolute assurance" test for indemnification.

procedural law of the forum state.  See N. Bergen Rex Transp. v. Trailer Leasing Co., 158 N.J. 561, 569 (1999) (citations omitted) (stating "the procedural law of the forum state applies even when a different state's substantive law must govern").  Our review of a ruling on summary judgment is de novo, applying the same legal standard as the trial court.  Townsend v. Pierre, 221 N.J. 36, 59 (2015).

Summary judgment must be granted if the court determines "that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."  R. 4:46-2(c).  The court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party."  Brill v. Guardian Life Ins. of Am., 142 N.J. 520, 540 (1995). We accord no special deference to the trial judge's conclusions on issues of law. Nicholas v. Mynster, 213 N.J. 463, 478 (2013).

A.  Prejudice

ALMI argues that the trial court erred in finding its conduct deprived Exxon of its right to defend because, relying on CIH, 821 F. Supp. 2d at 612, and Unigard II, 4 F.3d at 1068-1069, Exxon needed to show that late notice

resulted in a tangible economic injury or different litigation outcome to excuse its indemnification obligations. In support, it notes the settlement agreement lacked any language that granted Exxon the "sole right" to defend, "the right to control," or the "right to settle," and that it reserved with ALMI the right to "assume control of [its] own defense." Even if CIH is not applicable, it argues the trial court erred in concluding Exxon was materially deprived and prejudiced by ALMI's delay in notice and that such a holding is contrary to the purpose of the settlement agreement. We disagree with these contentions.

Under New York law, it is a "general contract law principle that a breach will excuse performance only if it is material or demonstrably prejudicial." Unigard Sec. Ins. v. N. River Ins., 594 N.E.2d 571, 584 (1992) (N.Y. App. Div. 1992) (Unigard I). A "technical failure or immaterial breach" does not excuse performance. Fiserv Sols., Inc. v. XL Specialty Ins., 94 A.D.3d 456, 460-61 (N.Y. App. Div. 2012).

In Hovdestad v. Interboro Mut. Indemnification Ins., 135 A.D.2d 783 (N.Y. App. Div. 1997), the New York Appellate Division held that an insurer was not required to indemnify its insured after the insurer failed to notify the insurer for four years and after pre-trial discovery occurred. The court held that even if the contract's notice requirement was not violated, the insured still would

have been relieved of indemnification because this was sufficient to show prejudice. Id. at 784. The Hovdestad court further explained that by the insured "initially assuming the defense of the counterclaim, the plaintiff's attorneys effectively deprived the defendant of the opportunity to participate in pretrial discovery proceedings when such would have been meaningful." Ibid.; see also Wainco Funding v. First Am. Title Ins. of N.Y., 219 A.D.2d 598, 599 (N.Y. App. Div. 1995) (holding a twenty-month delay in notice actually prejudiced a party because it was materially deprived of "the opportunity to participate" in proceedings).

In CIH, as explained by the New York Appellate Division:

> [T]he plaintiff sellers of a corporation agreed to indemnify the defendant buyer for certain tax losses. . . . [T]he CIH agreement required the buyer to provide prompt notice of tax claims . . . and entitled the seller to "control the conduct" and settlement of proceedings involving tax claims subject to indemnification, but provided that the buyer's failure to provide such notice would not defeat the sellers' indemnification obligation except to the extent the seller was "actually prejudiced" thereby. Relying solely on Unigard II, the CIH court concluded that the plaintiff seller must demonstrate "tangible economic injury" as a result of the late notice [to establish prejudice] because "[a]n indemnitor's loss of the right to associate in the defense of claims is insufficient to constitute prejudice."

27

> [Conergics, 144 A.D.3d at 527 n.10 (citations omitted).]

In Conergics, however, the parties entered an agreement for plaintiff to sell its company, which indemnified defendant with the "sole right" to defend any audit and noted the failure to give written notice did not affect indemnification unless "[the indemnifying party] is actually prejudiced." Id. at 518. Ten years after acquisition, the company was audited subject to indemnification, but defendant did not notify plaintiff until twenty-one months after the audit began. Id. at 519. During those twenty-one months, defendant undertook its own defense and was issued an adverse determination, two months before it sought indemnification from plaintiff. Id. at 520-21.

On appeal, the New York Appellate Division agreed that plaintiffs were not obligated to indemnify the defendants. Id. at 523-24. The court noted that plaintiff's "sole right" to control the defense was more analogous to a primary insurer's right to control the investigation and defense of a claim, "than to a reinsurer's more limited right to associate." Id. at 526-27. Unlike a primary insurer's right to control, a "reinsurer is not responsible for providing a defense, for investigating the claim[,] or for attempting to get control of the claim in order to effect an early settlement." Id. at 525 (quoting Unigard I, 594 N.E.2d at 583); see also Am. Home Assur., 684 N.E.2d at 18 (applying the same analysis to

28

excess insurers because they "have most of the rights and obligations of primary insurers" in that "[t]hey have the right to investigate claims and to participate in settlement negotiations").

The Conergics court distinguished CIH, finding it was "not persuaded" by CIH's "contrary holding" which failed to consider the differences between the right to associate with "the contractual right of the indemnitor to 'control the conduct' and settlement of the proceedings at issue." Conergics, 144 A.D.3d at 527 n.10. As a result, the court found it did not need to determine whether the Second Circuit's decision in Unigard II, which held that prejudice must be demonstrated by "tangible economic injury," was required in the reinsurance context. Id. at 526-27.

The Conergics court also found the indemnitor "cannot be expected to show precisely what the outcome would have been had timely notice been given." Id. at 530 (quoting Am. Ins. v. Fairchild Indus., Inc., 56 F.3d 435, 440-41 (2d Cir. 1995)). Comparing to the insurance context, it noted the uncertainty of the outcome is the result of the insured's failure to comply with the contract and the insured "should not be permitted to use that uncertainty as a weapon against the insurer." Ibid. (quoting Fairchild, 56 F.3d at 440-41).

29

Rather, the court concluded "it suffices for an indemnitor afforded the right to control the defense of an indemnifiable claim to show that it was deprived of its right to exercise that right for a material portion of the proceedings on the claim." Id. at 524. Applying this standard, the court found that the twenty-one-month period, which included an adverse decision, "more than [met] the standard of a material deprivation of the right to control the defense of the audit." Ibid.

Here, although the settlement agreement does not explicitly state that Exxon had the "sole right" to defend, it makes clear that default defense responsibilities laid with Exxon. Under Paragraph 4.1, Exxon was obligated to "[d]efend, indemnify, save, and hold harmless" ALMI from environmental liability claims. Paragraph 4.3 also obligated ALMI, after Exxon provided the identity of defense counsel, to accept Exxon's counsel "[a]bsent good cause," and allowed ALMI to "assume control of their own defense" only after giving Exxon written notice. Even ALMI acknowledges in its merits brief that Exxon had the "duty . . . to defend." ALMI, therefore, had no responsibility to defend unless so elected and, even if it assumed its defense, that did not obviate Exxon's initial, primary defense responsibilities.

Similar to the Conergics court's reasoning, Exxon's duty to defend is more akin to a primary insurer's sole right to defend, and ALMI's right to participate in its defense is more comparable to a reinsurer's right to associate since reinsurers are "not responsible for providing a defense." 144 A.D.3d at 525. As such, we reject ALMI's reliance on CIH, 821 F. Supp. 2d at 612, and Unigard II, 4 F.3d at 1068-69, and find that New York law does not require Exxon to show tangible economic harm to satisfy a finding of material deprivation of rights.

Further, CDE plainly provided notice of its claim of coverage related to the South Plainfield site to ALMI, at the latest, in its 1998 cross-claim against ALMI in which it sought a declaration "under [ALMI's] policies issued to CDE." Even if there was excusable delay in discovering the Exxon policies because of the complexity of the issues, the latest Exxon's policies should have been discovered is April 2001, when ALMI responded to CDE's discovery requests. The only reason ALMI did not actually know of these policies was because, as Judge Smithson found, it "intentionally fail[ed] to diligently engage in discovery." ALMI did not tender notice to Exxon until its March 2009 letter.

This approximately eight-year gap in notice, far from timely, materially deprived Exxon of its rights by preventing it from participating in the

proceedings for a significant amount of time. It also precluded Exxon from pursuing certain defense strategies no longer available to it, such as arbitration.

By the time ALMI notified Exxon, Judge Sabatino had already found the relevant insurance policies covered environmental harm that occurred at the South Plainfield site, and which prevented Exxon from engaging in its own defense against such coverage. Exxon also lost early settlement opportunities. Indeed, other claimants had already successfully settled with numerous other defendant insurance companies. As such, we agree with the court that ALMI materially deprived Exxon of its rights under the settlement agreement and excused its indemnification performance to provide ALMI with "peace and freedom" in connection to environmental liability claims.

B. No-Prejudice Rule

ALMI also contends the trial court erred in finding that the no-prejudice rule applied, and that Exxon's indemnification was excused because notice was an implied condition precedent under the settlement agreement. Even if there was an implied notice requirement, ALMI contends it did not breach it because: 1) CDE's 1992 letter to ALMI cannot reasonably constitute notice of a claim under the Exxon policies, 2) CDE did not assert broad claims for coverage prior to 2008, 3) the 2001 discovery violation cannot constitute a breach that excused

32

Exxon's performance, and 4) Exxon's repeated tender rejections show that Exxon did not believe CDE asserted a claim that triggered ALMI's obligation under the agreement until 2008. We reject all of these arguments.

As noted, actual prejudice is not required under the no-prejudice rule when notice is a condition precedent. Am. Home Assur., 684 N.E.2d at 16; see also Conergics, 144 A.D.3d at 523 (distinguishing the no-prejudice rule from whether late notice results in actual prejudice). "[A] condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.'" Accadia Site Contracting, Inc. v. Erie Cty. Water Auth., 115 A.D.3d 1351, 1352 (N.Y. App. Div. 2014) (alteration in original) (quoting MHR Cap. Partners LP v. Presstek, Inc., 912 N.E.2d 43, 47 (N.Y. 2009)). "[T]he duty to give reasonable notice as a condition of recovery is implied in all insurance contracts." Structure Tone v. Burgess Steel Prods. Corp., 249 A.D.2d 144, 145 (N.Y. App. Div. 1998) (citations omitted).

However, a party "to a contract cannot rely on the failure of another to perform a condition precedent where [the party] has frustrated or prevented the occurrence of the condition." VXI Lux Holdco S.A.R.L. v. SIC Holdings, LLC, 171 A.D.3d 189, 195 (N.Y. App. Div. 2019) (citation omitted). First created for

33

when "primary insurance requires notice 'as soon as practicable' after an occurrence," the no-prejudice rule discharges an insurer's performance in the absence of timely notice and "[n]o showing of prejudice is required."[7] Argo Corp. v. Greater N.Y. Mut. Ins., 827 N.E.2d 762, 764 (N.Y. 2005) (citations omitted). This rule was extended to liability insurance policies that required notice "as soon as practicable" because "[a] liability insurer, which has a duty to indemnify and often also to defend, requires timely notice of lawsuit in order to be able to take an active, early role in the litigation process and in any settlement discussions and to set adequate reserves." Id. at 765.

Applied in the context of an indemnity contract, the New York Appellate Division previously held an indemnitee that does not notify the indemnitor "proceeds at his own risk with regard to any judgment or settlement which may ultimately ensue." L.B. Kay Assocs., Ltd. v. Libov, 139 A.D.2d 440, 440 (N.Y. App. Div. 1988); see also Farrauto, 136 A.D.2d at 599 (holding an indemnification obligation was excused because the "insured's failure to provide timely notice of an occurrence vitiates the insurance contract . . . regardless of

---

[7] The New York Legislature abrogated this common law rule and now requires a showing of prejudice for insurance policies issued after January 17, 2009, well after when the Exxon policies were issued, and settlement agreement entered. See Waldron v. N.Y. Cent. Mut. Fire Ins., 88 A.D.3d 1053, 1054 (N.Y. App. Div. 2011) (citing N.Y. Ins. Law § 3420(a)(5)).

A-3011-18

whether the [insurance] policy contains a provision expressly warning the insured that failure to honor the condition requiring notice may result in a forfeiture of coverage").

Here, the court did not err in concluding the no-prejudice rule applied and that there was an implied condition precedent requiring notice in the settlement agreement. Although not an express condition, Exxon required notice of a claim from ALMI to fulfill its indemnification obligations under the contract and assume control of the defense strategy. The settlement agreement, therefore, included an implied notice condition to trigger Exxon's indemnification obligations.

As noted, the approximately eight-year gap between when ALMI should have discovered the Exxon policies and when it actually notified Exxon, was far from timely. Further, since Exxon's indemnification obligation, which arises from a contract settling disputes over insurance policies, is more comparable to a primary insurer's "right to control" than a reinsurer's "right to associate," see Conergics, 144 A.D.3d at 526-27, the court did not err in applying Farrauto, 136 A.D.2d at 599. When ALMI proceeded to trial against CDE in 2004, it did so "at [its] own risk with regard to any judgment or settlement which may ultimately ensue." L.B. Kay Assocs., 139 A.D.2d at 440. Without timely notice,

35

Exxon could not "take an active, early role in the litigation process and in any settlement discussions [or] set adequate reserves." Argo, 827 N.E.2d at 765.

C. Good Faith and Fair Dealing

ALMI further asserts the court erred in finding that it breached the duty of good faith and fair dealing because the court's ruling: 1) misinterpreted contract law in concluding its lack of diligence supported a finding of bad faith, 2) created an independent obligation beyond those agreed upon in the settlement agreement, and 3) was based on the same facts as its finding that ALMI breached the contract and thus had no independent basis. Again, we disagree.

"Every contract contains an implied covenant of good faith and fair dealing." P.T. & L. Contracting Corp. v. Trataros Const., Inc., 29 A.D.3d 763, 764 (N.Y. App. Div. 2006). The covenant "is breached when a party acts in a manner that would deprive the other party of the right to receive the benefits of their agreement." 1357 Tarrytown Rd. Auto, LLC v. Granit Props., LLC, 142 A.D.3d 976, 977 (N.Y. App. Div. 2016). The breaching action is not required to be "expressly forbidden by any contractual provision." P.T. & L. Contracting Corp., 29 A.D.3d at 764. This covenant "includes any promises which a reasonable promisee would be justified in understanding were included," but

there may be no implied obligation "that would be inconsistent with other terms of the contractual relationship." 1357 Tarrytown Rd. Auto, 142 A.D.3d at 977.

An action alleging breach of the covenant of good faith and fair dealing "must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Com., 265 A.D.2d 513, 514 (N.Y. App. Div. 1999) (citation omitted). In this regard, bad faith can be shown by "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." Stevens v. Publicis, S.A., 50 A.D.3d 253, 256 (N.Y. App. Div. 2008) (quoting Restatement (Second) of Contracts § 205, cmt. d (Am. Law Inst. 1981)). Pleading a breach of the implied covenant also "plead[s] a valid cause of action for breach of contract." 511 W. 232nd Owners Corp. v. Jennifer Realty Co., 773 N.E.2d 496, 501 (N.Y. 2002).

However, "[a] cause of action to recover damages for breach of the implied covenant of good faith and fair dealing cannot be maintained where the alleged breach is 'intrinsically tied to the damages allegedly resulting from a breach of the contract.'" Deer Park Enters., LLC v. Ail Sys., Inc., 57 A.D.3d

711, 712 (N.Y. App. Div. 2008) (quoting Canstar v. Jones Constr. Co., 212 A.D.2d 452, 453 (N.Y. App. Div. 1995)). Nor can the allegations be duplicative of those forming the breach of contract cause of action. Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc., 97 A.D.3d 781, 784-85 (N.Y. App. Div. 2012); see also J. Kokolakis Contracting Corp. v. Evolution Piping Corp., 998 N.Y.S.2d 788, 791 (Sup. Ct. 2014) (stating that a breach of the covenant of good faith and fair dealing is generally only actionable "where wrongs independent of the express terms of the contract are asserted and demands for the recovery of separate damages not intertwined with the damages resulting from a breach of a contract are advanced" (citations omitted)).

Here, the court did not err in finding that ALMI breached both the implied and express covenant of good faith and fair dealing embedded in the settlement agreement. As Judge Smithson already concluded, ALMI "intentionally fail[ed] to diligently engage in discovery." This ultimately deprived Exxon of "the right to receive the benefits of their agreement," 1357 Tarrytown Rd. Auto, 142 A.D.3d at 977, by preventing it from fulfilling its duty to defend the action and engaging in early settlement agreements.

Under these unique facts, ALMI's obligation to diligently address in CDE's discovery requests overlapped with its independent duty to "respond[]

and defend[]" against such environmental liability claims under the settlement agreement. We agree with the court that ALMI's failure of diligence did not need to be "expressly forbidden by any contractual provision" to constitute a breach. P.T. & L. Contracting Corp., 29 A.D.3d at 764. Further, while Exxon asserts violations of the covenant of good faith and fair dealing using the same facts as its claim for prejudice, an independent basis is only needed if Exxon was asserting a separate claim for damages in addition to a breach of contract claim, which it is not. See Deer Park Enters., 57 A.D.3d at 712.

In light of our decision that the court correctly found that ALMI's untimely notice actually prejudiced Exxon, violated the no-prejudice rule, and breached the covenant of good faith and fair dealing, we need not address whether it incorrectly applied common law principles as expressed in American Export, 390 F. Supp. 63. In summary, we conclude the court did not err in granting Exxon's motion for summary judgment and excusing its indemnification obligations under the settlement agreement.

IV.

Finally, ALMI argues the court committed error when it required ALMI to reimburse Exxon for litigation expenses and costs because: 1) Exxon accepted tender of the defense without a right to reimbursement, 2) the issue

39

was not addressed at oral arguments, and 3) the court did not set forth any reasons for its attorneys' fees award. It also contends the court improperly denied its motion for reconsideration by failing to set forth the reasons for denial.

We reject ALMI's arguments to the extent they maintain a remand is necessary to resolve its motion for reconsideration as we find no merit to ALMI's reconsideration application. We agree, however, that the court did not provide a sufficient basis for its award of attorneys' fees to Exxon. We accordingly remand for further factual findings consistent with Rule 1:7-4.

Our review of an award of attorneys' fees is deferential, Packard-Bamberger & Co., 167 N.J. at 444, and "fee determinations by trial courts will be disturbed only on the rarest occasions, and then only because of a clear abuse of discretion." Rendine v. Pantzer, 141 N.J. 292, 317 (1995). "A trial court decision will constitute an abuse of discretion where the decision [was] made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." Saffos v. Avaya Inc., 419 N.J. Super. 244, 271 (App. Div. 2011) (internal quotation marks and citations omitted); see also Curtis v. Finneran, 83 N.J. 563, 569 (1980) (stating a trial court's role in a non-

jury civil action "is to find the facts and state conclusions of law" (citing R. 1:7-4)).

Further, "[t]he decision to deny a motion for reconsideration falls 'within the sound discretion of the [trial court], to be exercised in the interest of justice.'" In re Belleville Educ. Ass'n, 455 N.J. Super. 387, 405 (App. Div. 2018) (alteration in original) (quoting Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996)). The trial court should grant motions for reconsideration only in those cases "which fall into that narrow corridor in which either (1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or (2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence." Ibid.

Here, while the parties' January 30, 2018 stipulation resolved the quantum of fees and costs potentially owed to Exxon, it was only after the court ordered ALMI to reimburse Exxon for any such expenses in its December 15, 2017 order, and subsequent to denying ALMI's motion for reconsideration on January 8, 2018. The court did so without an oral or written statement of reasons.

Although the parties agreed to the amount of any fee award, in light of the court's decision obligating ALMI to reimburse Exxon, a remand is necessary for the court to explain the legal and factual bases supporting its decision. We

therefore vacate Exxon's award of attorneys' fees in the December 15, 2017 order and January 31, 2019 final judgment, and remand for the court to make appropriate findings of fact and conclusions of law consistent with Rule 1:7-4(a). We express no opinion as to whether a fee award is appropriate in this matter.

With regard to ALMI's challenge to the court's denial of its reconsideration application, we agree that the court's February 2, 2018 order failed to include a statement of reasons as required by Rule 1:7-4. We disagree, however, that a remand is necessary as we have addressed the merits of ALMI's appeal, see supra Part III, and affirm the court's grant of summary judgment to Exxon. Under the circumstances, we find no principled reason to remand the matter for the court to provide its reasons for denying ALMI's motion.

To the extent we have not addressed ALMI's remaining arguments it is because we have determined that they are without sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(1)(E).

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

42

A-3011-18